IN THE COURT OF APPEALS OF NORTH CAROLINA

 2022-NCCOA-212

 No. COA17-1027-2

 Filed 5 April 2022

 Sampson County, Nos. 15CRS 53153-54, 15CRS 53165, 16CRS 50156

 STATE OF NORTH CAROLINA

 v.

 CORY DION BENNETT, Defendant.

 Appeal by defendant from order entered 9 February 2021 by Judge John E.

 Nobles, Jr. in Superior Court, Sampson County. Heard in the Court of Appeals 27

 April 2021.

 Attorney General Joshua H. Stein, by Assistant Attorney General Kristin J.
 Uicker, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Sterling
 Rozear, for defendant.

 STROUD, Chief Judge.

¶1 Defendant Cory Dion Bennett appeals from a trial court order overruling his

 objections, under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), to the

 prosecution’s peremptory strikes of two African-American jurors, R.S. and V.B.1 In a

 previous appeal, State v. Bennett, 374 N.C. 579, 843 S.E.2d 222 (2020) [hereinafter

 1 We use the juror’s initials throughout to protect their identity because they were struck in

 part due to allegations of and convictions for criminal activity.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 “Bennett II”], our Supreme Court found Defendant had presented the “necessary

 prima facie case of discrimination” required at the first step of Batson’s three step

 inquiry. Id., 374 N.C. at 581, 843 S.E.2d at 224. Defendant’s current appeal arises

 from the remand hearing on Batson’s second and third steps. Id. Because the trial

 court properly accepted the prosecutor’s race neutral reasons for striking the jurors,

 we reject Defendant’s argument the trial court clearly erred on Batson’s second step.

 Further, after evaluating all the relevant circumstances advanced by Defendant, we

 hold the trial court did not clearly err in determining Defendant had not met his

 burden of proving purposeful discrimination at Batson’s third step. Therefore, we

 affirm the trial court’s order overruling Defendant’s Batson objections.

 I. Background

¶2 We rely on our Supreme Court’s opinion in Bennett II to summarize the

 background of this case and Defendant’s initial appeal. Across two grand juries in

 2016, Defendant was charged with five counts of “possessing a precursor chemical

 with the intent to manufacture methamphetamine,” one count of manufacturing

 methamphetamine, one count each of trafficking in methamphetamine by

 manufacture and by possession, and one count of possession of a firearm by a felon.

 Bennett II, 374 N.C. at 581, 843 S.E.2d at 224–25. The charges came on for a jury

 trial in March 2017. Id., 374 N.C. at 581, 843 S.E.2d at 225.

¶3 Bennett II then summarized the history of three jurors, R.S., V.B., and R.C.,
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

because Defendant made a Batson objection after the prosecutor struck in succession

R.S. and V.B., who are African American, but passed on R.C., who is not. See 374

N.C. at 586, 843 S.E.2d at 227–28 (summarizing Batson objection). The Bennett II

Court listed the following about R.S.:

 In response to the prosecutor’s inquiry concerning whether
 any prospective juror had “ever been the victim of a crime,”
 [R.S.] responded that he had been the victim of a breaking
 or entering that had occurred approximately two years
 earlier; that, while law enforcement officers had
 investigated the incident, no one had ever been charged
 with the commission of the crime; and that [R.S.] believed
 that the investigating officers had handled the incident in
 a satisfactory manner. In addition, [R.S.] informed the
 prosecutor that, while he recognized one of the other
 prospective jurors, who worked at a local bank, his
 connection with this other prospective juror would not
 affect his ability to decide the case fairly and impartially in
 the event that he was selected to serve as a member of the
 jury.

 [R.S.] responded to prosecutorial inquiries concerning
 whether anything would make it difficult for him to be a
 fair and impartial juror and whether there was anything
 going on in his life that would make it difficult for him to
 serve on the jury in the negative. Similarly, [R.S.] denied
 having any religious, moral, or ethical concerns that would
 prevent him from voting to return a guilty verdict.

374 N.C. at 581–82, 843 S.E.2d at 225 (alterations to preserve juror confidentiality).

The prosecutor exercised a peremptory challenge to strike R.S. after he finished

questioning all the venire members initially seated in the jury box. Id., 374 N.C. at

582, 843 S.E.2d at 225.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

¶4 V.B., who is also African American, then replaced R.S., and our Supreme Court

 described her as follows:

 [V.B.] responded to the trial court’s initial questions by
 stating that she was not aware of any reason that she
 would be unable to be fair to either the State or defendant.
 [V.B.] . . . owned a beauty salon . . . [near] the courthouse.[2]
 After stating that she did not know anyone involved in the
 prosecution or defense of the case or any of the other
 prospective jurors, [V.B.] told the prosecutor that she had
 never been the victim of crime, a defendant or witness in a
 case, or a juror. In addition, [V.B.] stated that she did not
 have any strong feelings, either favorable or unfavorable,
 concerning the law enforcement profession; that she had
 not heard anything about the charges against defendant
 before arriving for jury selection; and that she would be
 able to be impartial to both sides. Similarly, [V.B.]
 expressed no reservations concerning the fact that
 possession of a firearm by a felon is unlawful and said that
 she was not confused by the distinction between the
 concepts of actual and constructive possession.

 [V.B.] stated that she would be able to listen to and fairly
 consider the testimony of a witness who had entered into a
 plea agreement with the State, that she did not know any
 of the other prospective jurors who were seated in the jury
 box with her, and that she understood that legal dramas on
 television were not realistic. To [V.B.]’s knowledge, neither
 she, a member of her family, nor a close friend had ever had
 a negative experience with a member of the law
 enforcement profession or a member of the District
 Attorney’s staff or had ever been charged with committing
 an offense other than speeding.

 2 We have removed the precise location of the beauty salon to protect V.B.’s identity.
 However, as we discuss later on, the existence of the salon near the courthouse is relevant
 because the prosecutor used it to explain his reasons for striking V.B.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

In response to further prosecutorial questioning, [V.B.]
stated that she understood that defendant was presumed
to be innocent; that he possessed the rights to a trial by
jury, to call witnesses to testify in his own behalf, and to
refuse to testify; and that any refusal on his part to testify
in his own behalf could not be held against him. Moreover,
[V.B.] stated that she understood the difference between
direct and circumstantial evidence, that she understood
that the State was required to establish defendant’s guilt
beyond a reasonable doubt, and that she would be required
as a member of the jury to assess the credibility of the
witnesses.

[V.B.] assured the prosecutor that she could listen to all of
the evidence, keep an open mind, and follow the law in
accordance with the trial court’s instructions; agreed with
the prosecutor’s comment that “the law is not always what
we think it is or what we would like it to be”; and
acknowledged that, in the event that she was selected to
serve as a juror in this case, she would be required to follow
the law and apply the law set out in the trial court’s
instructions to the facts. At that point, the following
colloquy occurred between the prosecutor and [V.B.]:

 MR. THIGPEN: Do you think you could reach a
 verdict based only on hearing the evidence from the
 witness stand, or do you feel like in order to reach a
 verdict or to make a decision you would have to
 actually watch the alleged event happen?
 [V.B.]: Yeah.
 MR. THIGPEN: Okay. You looked confused. Some
 people—I have had jurors before that have said, “I
 can’t make a decision until I see it happen.”
 [V.B.]: Uh-huh.
 MR. THIGPEN: Okay. Do you feel like you could
 base your decision on just what the witnesses say, or
 do you feel like you have to watch it happen?
 [V.B.]: Kind of on both.
 MR. THIGPEN: What do you mean?
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 [V.B.]: Sometimes, I guess, it’s better to not have
 hearsay.
 MR. THIGPEN: Well, if you watched it happen, you
 would be a witness; right?
 [V.B.]: Right.
 MR. THIGPEN: And if you were a witness, you can’t
 be a juror. Does that make sense?
 [V.B.]: Yes.
 MR. THIGPEN: So the only thing we have is witness
 testimony.
 [V.B.]: Okay.
 MR. THIGPEN: So do you feel like you could make a
 decision based only on hearing the testimony of the
 witnesses or before you could make that decision
 would you actually want to watch it happen?
 [V.B.]: Yeah.
 MR. THIGPEN: Okay. What you said was, “Yeah.”
 [V.B.]: Yeah, I could make that decision through—
 MR. THIGPEN: Based on the testimony?
 [V.B.]: Uh-huh.

 After reiterating that nothing would make it difficult for
 her to be fair and impartial to either side and that nothing
 was going on in her life outside of the courtroom that would
 render jury service unduly burdensome, [V.B.] stated that
 she did not have any religious, moral, or ethical concerns
 about voting for a guilty verdict in the event that the State
 satisfied its burden of proof.

 Id., 374 N.C. at 582–84, 843 S.E.2d at 225–26 (alterations to preserve juror

 confidentiality). The prosecutor then also peremptorily challenged V.B. Id., 374 N.C.

 at 584, 843 S.E.2d at 226.

¶5 Juror R.C., who is not African American, then replaced V.B., and the Supreme

 Court described her as follows:
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

In responding to the trial court’s initial questions, [R.C.]
stated that there was no reason that she could not be fair
to either the State or defendant. . . . . In response to
prosecutorial questions, [R.C.] said that she did not know
the prosecutor, defendant, or defendant’s attorney. [R.C.]
denied having ever been the victim of a crime, a defendant,
or a witness in a case. However, [R.C.] had served as a
member of a criminal jury in Sampson County about thirty
years earlier. According to [R.C.], the jury upon which she
served had deliberated on the case, she had not served as
the foreperson of the jury, and nothing about that
experience would impact her ability to serve on the present
jury.

[R.C.] denied having strong feelings, either favorable or
unfavorable, about the law enforcement profession and
indicated that she had not read, heard, or seen anything
about the charges against defendant before arriving in
court for jury service. In addition, [R.C.] denied having any
reservations about the fact that felons are prohibited from
possessing firearms and expressed no confusion about the
difference between actual and constructive possession.
During a colloquy with the prosecutor, [R.C.] gave the
following answers:

 MR. THIGPEN: Okay. Now, [R.C.], a witness may
 testify on behalf of the State as a result of a plea
 agreement with the State in exchange for [a]
 sentence concession. Based on that fact and that fact
 alone, would you not be able to consider that person’s
 testimony along with all other evidence that you
 would hear in the case?
 [R.C.]: Yes, sir. No, sir.
 MR. THIGPEN: Do you understand my question?
 [R.C.]: Say it again.
 MR. THIGPEN: A witness may testify under a plea
 agreement in exchange for a sentence concession.
 [R.C.]: Okay.
 MR. THIGPEN: Now if that person were to testify,
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 are you just going to go, [t]his person’s made a deal;
 I don’t care what they are going to say, or would you
 listen to it and consider it just like anybody else?
 [R.C.]: I would listen to their testimony and consider
 it.

[R.C.] did not know any of the other prospective jurors and
understood that legal dramas were not based upon reality.

[R.C.] told the prosecutor that neither she, a member of her
family, nor a close friend had ever had an unpleasant
experience with a law enforcement officer or a member of
the District Attorney’s staff. [R.C.] acknowledged that
certain drug charges involving her brother had been
resolved, stated that she felt that the law enforcement
officers involved in that situation had treated her brother
fairly, and said that nothing about that experience would
affect her ability to be a fair and impartial juror. [R.C.]
understood that defendant was presumed to be innocent
until proven guilty beyond a reasonable doubt; that he
possessed the right to trial by jury, to call witnesses in his
own behalf, and to refuse to testify; and that any decision
that he might make to refrain from testifying in his own
behalf could not be held against him.

[R.C.] told the prosecutor that she understood the
difference between direct and circumstantial evidence and
that, as a member of the jury, she would be required to
assess the credibility of the witnesses. [R.C.] expressed
confidence in her ability to listen to all of the evidence, keep
an open mind, and follow the law in accordance with the
trial court’s instructions. [R.C.] agreed with the prosecutor
that “the law is not always what we think the law is or
what you think it should be” and that, as a juror, she would
be required to use common sense, follow the law, and apply
the law to the facts. In addition, [R.C.] stated that she
“would not have to see the event happen”; that she could
reach a verdict based upon the testimony of witnesses; and
that she did not know of anything that would make it
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 difficult for her to be fair and impartial to both the State
 and defendant.

 When the prosecutor inquired whether there was anything
 occurring in her life outside of the courtroom that would
 make jury service difficult, [R.C.] mentioned her work-
 related obligations and stated that she was supposed to
 take her daughter-in-law to a doctor’s appointment. On the
 other hand, [R.C.] agreed that the other prospective jurors
 probably had similar employment-related concerns and
 acknowledged that her daughter-in-law could use some
 other means to get to her appointment. Finally, [R.C.]
 stated that she did not have any religious, moral, or ethical
 concerns that would prevent her from voting to return a
 guilty verdict.

 Id., 374 N.C. at 584–86, 843 S.E.2d at 226–27 (alterations to preserve juror

 confidentiality). The prosecutor then accepted R.C. as a juror. Id., 374 N.C. at 586,

 843 S.E.2d at 227.

¶6 After the prosecutor accepted R.C., Defendant made a Batson motion on the

 grounds that R.S. and V.B. were both Black and had both been excused. Id., 374 N.C.

 at 586, 843 S.E.2d at 227–28. Defendant’s attorney argued: “there was no

 overwhelming evidence, there was nothing about any prior criminal convictions, any

 feelings about—towards or against law enforcement, there’s no basis, other than the

 fact that those two jurors happen to be of African[ ]American de[s]cent [and] they

 were excused.” Id., 374 N.C. at 586–87, 843 S.E.2d at 228 (alterations in original).

 The prosecutor argued Defendant had not passed Batson’s first step because he had

 not made a prima facie showing of discrimination simply by indicating both struck
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 jurors were Black. Id., 374 N.C. at 587, 843 S.E.2d at 228. After noting the prosecutor

 had already accepted three African-American jurors before striking R.S. and V.B., the

 trial court denied Defendant’s Batson motion because Defendant had not made a

 prima facie showing. Id.

¶7 After the jury convicted Defendant of all charges, except the possession of a

 firearm by a felon, and the trial court sentenced him, Defendant appealed to this

 Court arguing he had made a prima facie showing under Batson.3 Id., 374 N.C. at

 587–88, 843 S.E.2d at 228–29. This Court held Defendant failed to make a prima

 facie case. Id., 374 N.C. at 588, 843 S.E.2d at 229. The Supreme Court granted

 discretionary review. Id., 374 N.C. at 590, 843 S.E.2d at 230.

¶8 On review, the Supreme Court reversed this Court and concluded Defendant

 presented a prima facie case of discrimination. Id., 374 N.C. at 581, 843 S.E.2d at

 224. First, the court noted the numerical disparity in acceptance rates of African

 American versus white prospective jurors. Id., 374 N.C. at 599, 843 S.E.2d at 235. It

 then highlighted “the absence of any significant dissimilarity between the answers

 3 During Defendant’s initial appeal, the State questioned whether the record contained
 sufficient information about the jurors’ races to have preserved the Batson issue for review.
 See id., 374 N.C. at 588–90. 843 S.E.2d at 229–30 (explaining the State raised the issue and
 recounting how this Court addressed the issue). The Supreme Court upheld this Court’s
 ruling “that the record contains sufficient information to permit us to review the merits of
 [D]efendant’s Batson claim.” Id., 374 N.C. at 594, 843 S.E.2d at 233. As part of the order on
 appeal here, the State and Defendant ultimately agreed to the race of each prospective juror,
 so we do not need to revisit the issue.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 given by” R.S., V.B., and R.C. or “any apparent indication arising from the face of the

 record that either” R.S. or V.B. “would not have been satisfactory jurors from a

 prosecutorial point of view . . . .” Id., 374 N.C. at 599, 843 S.E.2d at 235–36. Finally,

 the Supreme Court rejected the State’s argument that the prosecutor’s acceptance of

 three African-American jurors before and of a further two after striking R.S. and V.B.

 negated the prima facie case of discrimination. Id., 374 N.C. at 600–01, 843 S.E.2d

 at 236–37.

¶9 Based on that ruling, the Supreme Court remanded the case to this Court for

 further remand to the trial court “for a hearing to be held for the purpose of

 completing the second and third steps” of the Batson analysis. Id., 374 N.C. at 602–

 03, 843 S.E.2d at 238. As the Supreme Court had previously summarized, step two

 obligated the prosecutor to present a “race-neutral explanation for the challenge,”

 and step three required the trial court to determine “whether the defendant has met

 the burden of proving purposeful discrimination.” Id., 374 N.C. at 592, 843 S.E.2d at

 231 (quoting State v. Waring, 364 N.C. 443, 474–75, 701 S.E.2d 615, 636 (2010)).

¶ 10 The trial court held the required remand hearing on 4 November 2020. At the

 remand hearing, the prosecutor addressed step two by offering race neutral reasons

 for striking R.S. and V.B. He explained he struck R.S. for failing to disclose a criminal

 record:

 So as it relates to, first, Perspective [sic] Juror
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 Number 10, [R.S.], Judge, based upon the information that
 I had, [R.S.] had an undisclosed criminal record that
 included a conviction for common law robbery and
 possession with intent to sell an unauthorized recording
 device from Pitt County and a probation violation. I made
 a note of his record. When he was called into the box, and
 if it -- and it was important to me because of the prior felony
 conviction. He’s the only juror of which I made that note
 and he’s the only juror that I noted had a prior felony
 conviction.
 I asked the panel twice, including [R.S.], while he
 was in the panel about a criminal history. I asked, first, if
 anyone had ever been a defendant in a case before, and I
 explained what that meant. Secondly, I asked if a juror, a
 member of their family, or a close friend had been charged
 or convicted of anything other than speeding. [R.S.] did not
 answer.

¶ 11 The prosecutor then offered two reasons to justify his strike of V.B., an answer

 to a question exhibiting confusion and concerns her business was linked to a drug

 investigation:

 As it relates to [V.B.], Judge, she appeared to have
 some difficulty with what I call the “watch-it-happen
 question.” And that’s a question that came out of an older
 sexual assault case that two of my colleagues tried several
 years ago. The jury hung 11 to 1, actually it was tried in
 another county. The holdout juror in that case said he could
 not make a decision unless he saw it happen. So after that
 trial, we started working into our jury selection, a question
 about whether or not a juror could make a decision based
 only upon hearing testimony.
 I noted that [V.B.] looked confused by the question.
 She said she could base her decision on “kind of both” or
 “kind of on both.” I tried to clarify that by asking her what
 she meant and she replied, “Sometimes I guess it’s better
 not to have hearsay.”
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 Well, Judge, that told me that she preferred maybe
video evidence or something other than just live testimony.
I knew that there would not be any video testimony.
Officers in this case don’t have or did not wear body
cameras and did not have in-car. I tried to clarify that
question again and her answer was, “Yeah.” I asked the
question again and her she [sic] responded, “Uh-huh.” So,
at that point, I’m beginning to get concerned that she’s
telling me what she thinks I want to hear, and I’m
questioning does she understand what I’m asking. She is
the only juror that gave those responses and had that
apparent difficulty with that question.
 Also, as it relates to [V.B.], Deputy Gore was seated
with me at counsel table. She’s here today, seated further
away due to concerns with the virus, but she was seated
with me at counsel table, and that’s been my practice
during jury selection, for my career, to have the charging
officer sit with me. Deputy Gore has been a drug officer
since 2008. At the end of my questions, I asked for a
moment and conferred with Deputy Gore. Deputy Gore
expressed concerns to me about [V.B.]’s business regarding
a prior drug investigation . . . .
 I asked [V.B.], specifically, about her business to
determine which beauty salon she referred to. . . . . So I
asked her to clarify that. I then asked for a moment to
confer with Deputy Gore again. Deputy Gore indicated that
she believed that [V.B.]’s salon had been part of the . . .
investigation, which I was aware of and knew was a
multiagency drug investigation.
 I was familiar with [the target of the drug
investigation] and I recalled seeing him outside the beauty
salon and the barbershop. The beauty salon she identified
is actually, I believe that’s . . . [near] the courthouse. . . . .
 . . . . I was concerned that [V.B.], in addition to the
issues with the -- what I call the watch-it-happen question,
that she could be fair if her business was part of a drug
investigation. So those would be my reasons for my two
challenges.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

¶ 12 After receiving that information, Defendant’s counsel took a few minutes to

 confer. The trial court then offered them a recess if they wanted it, but they

 responded “I don’t think that’s necessary. I appreciate it. I think we’re good.”

¶ 13 As an initial matter related to the strike of R.S., Defendant argued the record

 did not include evidence of his prior conviction, but the trial court told him to either

 present evidence to the contrary or move on:

 [MR. ROZEAR (one of Defendant’s attorneys)]: . . . . And I
 first note that we don’t have anything in the record in front
 of us showing the existence of this conviction, so I’m not
 sure that –
 THE COURT: Are you saying that Mr. Thigpen is not
 correct when he said he had that criminal record?
 MR. ROZEAR: I -- I -- I don’t know. I have no --
 THE COURT: The Court’s accepting that as the gospel. I
 don’t think he would have said that if that wasn’t the case.
 I can’t imagine -- now if it isn’t the case, obviously, we’ve
 got a problem.
 MR. ROZEAR: Right.
 THE COURT: But I don’t think I would make that
 accusation unless you’ve got some basis for it.
 MR. ROZEAR: Fair enough, Your Honor.

¶ 14 At the remainder of the remand hearing, Defendant presented numerous

 reasons the trial court should find the prosecutor’s explanations were pretextual at

 Batson’s third step. He first argued the strike rate evidenced discrimination.

 Specifically, defense counsel noted the prosecutor had a strike rate of 40% for Black

 jurors and 0% for non-Black jurors in the case. As part of that argument, Defendant

 contended the trial court should not find a lack of discrimination simply because the
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 prosecutor accepted some Black jurors. While the prosecutor accepted three Black

 jurors before R.S. and V.B. and accepted two more after, Defendant proposed that

 because the prosecutor struck R.S. and V.B. from the same seat in succession, this

 demonstrated “they didn’t want a [B]lack juror in” that seat. In response, the

 prosecutor asked the trial court to assess his credibility to determine he was not

 passing on other Black jurors to cover his strikes of R.S. and V.B.

¶ 15 Defendant then argued the prosecutor’s explanation for striking R.S., based on

 his undisclosed criminal record, was pretext because the prosecutor never asked R.S.

 about it. The prosecutor responded by explaining his usual process for jury selection;

 he had an assistant run criminal history checks on all the potential jurors and then

 made “a cheat sheet” with all the information to quickly assess it during jury

 selection. Further, the prosecutor did not want to embarrass R.S. by bringing up his

 criminal conviction during the voir dire.

¶ 16 Defendant made a similar argument that the prosecutor did not question V.B.

 about her business’s connection to the drug investigation. The prosecutor responded

 he did not want to embarrass V.B. or reveal law enforcement’s methods of undercover

 investigation.

¶ 17 Further, Defendant challenged the prosecutor’s explanation he struck V.B. for

 her difficulty with the “watch-it-happen question.” First, Defendant asserted in

 Bennett II our Supreme Court said “there was nothing in the record that showed a
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 difference between the jurors.” Defendant also contended a comparison with R.C.

 based on difficulty with a question would show R.C., who is not Black, and V.B., who

 is Black, were similarly situated. The prosecutor responded to the comparison that

 the difference between the questions R.C. and V.B. demonstrated confusion about

 was critical. R.C.’s answer was “not as big an issue” to him because he “expect[ed]

 people to be skeptical of confidential informants, of cooperating codefendants” and

 was not planning on calling the witness who would be testifying pursuant to the plea

 agreement. By contrast, the question he asked to V.B. was critical because he was

 concerned “she regarded testimony as hearsay” and his whole case was “going to be

 witness testimony.”

¶ 18 After that comparison, Defendant argued the trial court should consider the

 susceptibility of the case to racial bias on the basis Defendant is Black and was

 charged with a drug offense. To support that argument, Defendant presented

 statistics showing Black people were disproportionately arrested and sentenced for

 drug crimes. Defendant also presented as exhibits various reports supporting their

 data. The prosecutor responded the case was not susceptible to racial discrimination

 because this was a drug case without victims so there could not be a cross-racial

 crime.

¶ 19 Finally, Defendant argued historical evidence showed Sampson County

 prosecutors disproportionately struck qualified Black jurors. To support that
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 argument, Defendant entered as exhibits two studies with data on juror strike rates

 by race that showed qualified Black jurors were struck disproportionately to qualified

 non-Black jurors. The prosecutor responded the main study was not reliable because

 it: (1) did not include the experiences of prosecutors; (2) relied on law students and

 recent graduates to collect data; and (3) was gathered off a cold trial transcript. The

 prosecutor further argued it was wrong to impute to him another prosecutor’s alleged

 use of a peremptory strike based on race.

¶ 20 At the end of the hearing, the trial court requested both sides present proposed

 orders. Both sides also agreed an order could be entered out of county and out of

 session.

¶ 21 On 9 February 2021, the trial court entered an order overruling Defendant’s

 Batson objections as to both R.S. and V.B. After recounting the history of the case,

 the order first listed the agreed-upon races of each prospective juror. The trial court

 then recounted how our Supreme Court had already determined Defendant met his

 burden on Batson’s first step and how the case was remanded for a hearing on the

 remaining two steps. As to Batson’s second step, the trial court found the prosecutor

 “met his burden of production and provided race-neutral reasons for his use of

 peremptory challenges to both” R.S. and V.B.

¶ 22 On Batson’s third step, the order explained the trial court weighed the totality

 of the circumstances surrounding the strikes and found the prosecutor’s “proffered
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 reasons were the actual reasons for the peremptory challenges” and his challenges of

 R.S. and V.B. were not made “on the basis of race.” To support that conclusion the

 trial court first found the case was not susceptible to racial discrimination because

 there were no cross-racial identifications by witnesses nor cross-racial victims; as a

 corollary the trial court found Defendant is African American, there are no victims,

 and there was no record of the race of key witnesses. On the same factor, in relation

 to Defendant’s evidence of racial disparities in drug arrests and sentencing, the trial

 court found: “These facts, if true, would not give a prosecutor motivation to keep

 members of a particular race off the jury.”

¶ 23 The trial court further determined the prosecutor did not engage in disparate

 questioning or investigation. It also did not credit side-by-side comparisons. The

 order then recounted how the prosecutor accepted three African-American jurors

 before the Batson challenge and a further two after it, thereby “negat[ing] an

 inference of racial discrimination or motivation.” The trial court further discounted

 the statistical evidence of racially disproportionate strikes in Sampson County

 because: (1) the prosecutor in this case was not involved with the cases examined in

 the studies; (2) the studies did not take into account prosecutors’ viewpoints; (3) the

 study used recent law graduates to collect data; and (4) the studies were conducted

 using “cold trial transcripts.” With regard to the strike of R.S., the order finally

 specifically recounted how the prosecutor checked all potential jurors’ criminal
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 records and did not ask R.S. about the conviction to avoid embarrassing him. Based

 on those findings, the order overruled both of Defendant’s Batson objections.

¶ 24 Defendant appealed directly to the Supreme Court of North Carolina, and it

 remanded to this Court “with instructions to examine the order that was entered by

 the trial court on remand on 9 February 2021 and to conduct any further review of

 that order that it deems appropriate . . . .”

 II. Analysis

¶ 25 “The use of peremptory challenges for racially discriminatory reasons violates

 the Equal Protection Clause of the Fourteenth Amendment to the United States

 Constitution.”4 State v. Locklear, 349 N.C. 118, 136, 505 S.E.2d 277, 287 (1998)

 (citing Batson, 476 U.S. 79, 106 S. Ct. 1712). When a court must determine whether

 a prosecutor violated Batson by exercising a peremptory challenge based on race, it

 employs a three-step inquiry:

 First, the party raising the claim must make a prima facie
 showing of intentional discrimination under the totality of
 the relevant facts in the case. Second, if a prima facie case
 is established, the burden shifts to the State to present a
 race-neutral explanation for the challenge. Finally, the

 4 While Article I, Section 26 of the North Carolina Constitution also bars racially
 discriminatory peremptory strikes, Locklear, 349 N.C. at 136, 505 S.E.2d at 287, Defendant
 argues based on the United States Constitution alone. Even if Defendant were arguing under
 the North Carolina Constitution, our analysis under Article I, Section 26 would be identical.
 See Waring, 364 N.C. at 474, 701 S.E.2d at 635 (“Our review of race-based or gender-based
 discrimination during petit jury selection has been the same under both the Fourteenth
 Amendment to the United States Constitution and Article 1, Section 26 of the North Carolina
 Constitution.”).
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 trial court must then determine whether the defendant has
 met the burden of proving purposeful discrimination.

 Bennett II, 374 N.C. at 592, 843 S.E.2d at 231 (quoting Waring, 364 N.C. at 474–75,

 701 S.E.2d at 636).

¶ 26 Here, our Supreme Court, in Bennett II, already determined Defendant

 established “the necessary prima facie case of discrimination” under Batson step one.

 374 N.C. App. at 581, 843 S.E.2d at 224. Defendant presents challenges to the trial

 court’s analysis under Batson steps two and three. We explain the standard of review

 before turning to Defendant’s arguments under steps two and three.

 A. Standard of Review

¶ 27 When reviewing a trial court’s Batson analysis, “a trial court’s ruling on the

 issue of discriminatory intent must be sustained unless it is clearly erroneous.”

 Snyder v. Louisiana, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207 (2008); State v. Clegg,

 2022-NCSC-11, ¶50 (quoting same language from Snyder). “Such ‘clear error’ is

 deemed to exist when, on the entire evidence[,] the Court is left with the definite and

 firm conviction that a mistake has been committed.” Clegg, ¶ 37 (quoting Bennett II,

 374 N.C. at 592, 843 S.E.2d at 231) (alteration in original). This deferential standard

 reflects that “[a] trial court’s rulings regarding race-neutrality and purposeful

 discrimination are largely based on evaluations of credibility . . . .” State v. King, 353

 N.C. 457, 469–70, 546 S.E.2d 575, 586–87 (2001). As our courts have recognized
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 before, trial courts are “in the best position to assess the prosecutor’s credibility . . .

 .” State v. Cummings, 346 N.C. 291, 309, 488 S.E.2d 550, 561 (1997); see also

 Hernandez v. New York, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869 (1991) (explaining

 “evaluation of the prosecutor’s state of mind based on demeanor and credibility lies

 peculiarly within a trial judge’s province” (quotations and citation omitted)).

¶ 28 Under the clearly erroneous standard, “[t]he trial court’s findings will be

 upheld on appeal unless the ‘reviewing court on the entire evidence [would be] left

 with the definite and firm conviction that a mistake ha[d] been committed.’” State v.

 Chapman, 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005) (quoting Hernandez, 500

 U.S. at 369, 111 S. Ct. at 1871) (alterations in original). “Where there are two

 permissible views of the evidence, the factfinder’s choice between them cannot be

 clearly erroneous.” King, 353 N.C. at 470, 546 S.E.2d at 587 (quotations and citations

 omitted); see also Hernandez, 500 U.S. at 369, 111 S. Ct. at 1871 (including identical

 language). This deference, however, “does not by definition preclude relief.” Bennett

 II, 374 N.C. at 592, 843 S.E.2d at 231 (quoting Miller-El v. Dretke (Miller-El II), 545

 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005)). Applying the clearly erroneous standard

 of review, we now turn to Defendant’s contentions.

 B. Batson Step Two

¶ 29 Defendant first argues, under Batson’s second step, the trial court clearly erred

 in concluding “that the prosecutor had offered race-neutral explanations for the
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 strikes of two jurors . . . .” Specifically, Defendant contends “the record must support

 a purported justification for a strike . . . .” Defendant then claims two of the

 prosecutor’a justifications for striking jurors R.S. and V.B.—namely R.S.’s

 undisclosed criminal record and a connection between V.B.’s business and a drug

 investigation—were not supported by the record. Before reaching the merits of

 Defendant’s argument, we respond to the State’s contention Defendant failed to

 preserve his step two arguments.

 1. Preservation

¶ 30 The State first asserts Defendant did not preserve this argument because he

 “did not challenge the race-neutral character of the prosecutor’s reasons or argue that

 the reasons did not otherwise satisfy step two of Batson.” (Underline changed to

 italics.) Instead, the State contends Defendant’s arguments went to step three and

 whether the reasoning was pretextual.

¶ 31 Under Rule of Appellate Procedure 10(a)(1), a party must present and “obtain

 a ruling” on an objection, motion, or other request to a trial court to preserve it for

 appellate review. N.C. R. App. P. 10(a)(1). Our courts have also “long held that where

 a theory argued on appeal was not raised before the trial court, the law does not

 permit parties to swap horses between courts in order to get a better mount in” an

 appellate court. State v. Sharpe, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (quotations
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 and citations omitted). To properly preserve an issue for appellate review, therefore,

 a defendant must (1) raise the issue below and (2) argue the same theory below.

¶ 32 Our review of the remand hearing transcript reveals it was not neatly divided

 into steps two and three, and we would not necessarily expect it to be once the

 prosecutor proffered some reason for his strikes. Still, Defendant’s attorneys brought

 up the lack of evidence in the record for R.S.’s conviction before being cut off by the

 trial court and told the trial court was accepting the prosecutor’s representation given

 Defendant lacked evidence to the contrary:

 [MR. ROZEAR (one of Defendant’s attorney’s)]: . . . . And I
 first note that we don’t have anything in the record in front
 of us showing the existence of this conviction, so I’m not sure
 that –
 THE COURT: Are you saying that Mr. Thigpen is not
 correct when he said he had that criminal record?
 MR. ROZEAR: I -- I -- I don’t know. I have no --
 THE COURT: The Court’s accepting that as the gospel. I
 don’t think he would have said that if that wasn’t the case.
 I can’t imagine -- now if it isn’t the case, obviously, we’ve
 got a problem.
 MR. ROZEAR: Right.
 THE COURT: But I don’t think I would make that
 accusation unless you’ve got some basis for it.
 MR. ROZEAR: Fair enough, Your Honor.

 (Emphasis added.) While the trial court’s intervention prevented Defendant’s

 attorney from finishing his argument, Defendant’s counsel started arguing the lack

 of evidence in the record was a problem. Given Defendant’s attempt to argue under
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 the lack-of-evidence theory and the trial court’s subsequent intervention, we are not

 comfortable concluding Defendant failed to preserve his Batson step two argument.5

¶ 33 The State also argues Defendant’s argument on appeal “actually contradicts

 his argument in the trial court.” Specifically, the State contends Defendant

 “implicitly recognized the [prosecutor’s] explanation’s race-neutral character” by

 recognizing that R.S.’s failure to disclose his criminal record could have amounted to

 a challenge for cause. The State cites Hernandez in support of its argument that a

 reason offered by the prosecutor is race neutral if it “corresponds to a valid for-cause

 challenge.” 500 U.S. at 362–63, 111 S. Ct. 1868.

¶ 34 Again we reject the State’s argument. In the portion of the transcript to which

 the State cites, Defendant’s attorney is arguing under Batson step three as seen by

 his focus on whether the undisclosed conviction was the real issue or was merely

 pretextual: “So if this were really the issue, Mr. Thigpen probably could have had

 [R.S.] excused for cause by investigating this area further, and not had to use a

 peremptory in this case.” (Emphasis added.) Notably, this statement also occurred

 after the trial court had made its above statements about accepting the prosecutor’s

 proffered explanation “as the gospel.” As we explained above, the trial court’s

 comments came after it interrupted arguments from Defendant’s counsel under step

 5 Our lack of definite determination of the preservation issue ultimately does not alter our

 conclusion on the step two issue because we reject Defendant’s arguments on the merits.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 two, so the Defendant’s attorneys were merely continuing with the Batson inquiry

 after the trial court’s adverse ruling. Given that sequence of events, we do not accept

 the State’s argument that Defendant implicitly waived his step two argument. Since

 we do not credit either of the State’s preservation arguments, we proceed to evaluate

 Defendant’s Batson step two arguments on the merits.

 2. Merits

¶ 35 Under Batson’s second step, once a defendant has made a prima facie showing

 of intentional discrimination, “the analysis proceeds to . . . where the State is required

 to provide race-neutral reasons for its use of a peremptory challenge.” State v. Hobbs,

 374 N.C. 345, 352, 841 S.E.2d 492, 499 (2020) (citing Flowers v. Mississippi, __ U.S.

 __, 139 S. Ct. 2228, 2243 (2019)). As our Supreme Court recently summarized:

 The State’s explanation must be clear and
 reasonably specific, but does not have to rise to the
 level of justifying a challenge for cause. See [State v.]
 Bonnett, 348 N.C. [417,] 433, 502 S.E.2d [563,] 574
 [1998]; State v. Porter, 326 N.C. 489, 498, 391 S.E.2d
 144, 151 (1990). Moreover, “ ‘unless a discriminatory
 intent is inherent in the prosecutor’s explanation,
 the reason offered will be deemed race neutral.’ ”
 Bonnett, 348 N.C. at 433, 502 S.E.2d at 574–75
 (quoting Hernandez, 500 U.S. at 360, 111 S. Ct. at
 1866, 114 L. Ed. 2d at 406); see also Purkett v. Elem,
 514 U.S. 765, 768-69, 115 S. Ct. 1769, 1771–72, 131
 L. Ed. 2d 834, 839-40 (1995); State v. Barnes, 345
 N.C. 184, 209-10, 481 S.E.2d 44, 57, cert. denied, 522
 U.S. 876, 118 S. Ct. 196, 139 L. Ed. 2d 134 (1997),
 and cert. denied, 523 U.S. 1024, 118 S. Ct. 1309, 140
 L. Ed. 2d 473 (1998). In addition, the second prong
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 provides the defendant an opportunity for
 surrebuttal to show the State’s explanations for the
 challenge are merely pretextual. See State v. Gaines,
 345 N.C. 647, 668, 483 S.E.2d 396, 408, cert. denied,
 522 U.S. 900, 118 S. Ct. 248, 139 L. Ed. 2d 177
 (1997); State v. Robinson, 330 N.C. 1, 16, 409 S.E.2d
 288, 296 (1991).

 [State v.] Golphin, 352 N.C. [364,] 426, 533 S.E.2d [168,]
 211 [2000]. Therefore, at Batson’s second step, the State
 offers explanations for the strike which must, on their face,
 be race-neutral. If they are, then the court proceeds to the
 third step.

 Id., 374 N.C. at 352–53, 841 S.E.2d at 499.

¶ 36 Expanding upon that summary, the requirement that the State’s explanation

 must be clear and reasonably specific means the prosecutor must do more than

 “merely deny[] that he had a discriminatory motive” or “merely affirm[] his good

 faith.” Purkett, 514 U.S. at 769, 115 S. Ct. at 1771. “Furthermore, if not racially

 motivated, the prosecutor may exercise peremptory challenges on the basis of

 legitimate hunches and past experience.” State v. Lyons, 343 N.C. 1, 13, 468 S.E.2d

 204, 209 (1996). Notably, the reason does not have to be “a reason that makes sense,

 but a reason that does not deny equal protection.” Purkett, 514 U.S. at 769, 115 S.

 Ct. at 1771; see also id., 514 U.S. at 767–68, 115 S. Ct. at 1771 (“The second step of

 this process does not demand an explanation that is persuasive, or even plausible.”);

 Clegg, ¶ 47 (citing the same Purkett quote about an explanation not needing to be

 persuasive or even plausible); Lyons, 343 N.C. at 13, 468 S.E.2d at 209 (“The
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 prosecutor is not required to provide an explanation that is persuasive, or even

 plausible.”). This concept is what Hobbs means by its statement that the reason will

 be race-neutral unless discriminatory intent is inherent. 374 N.C. at 352, 841 S.E.2d

 at 499.

¶ 37 Further, while Hobbs’s summary includes a defendant’s opportunity for a

 surrebuttal within step two, that simply sets up step three where the trial court must

 decide whether the defendant met his burden of showing intentional discrimination.

 See Clegg, ¶ 63 n.4 (explaining after the prosecutor offers race-neutral reasoning at

 step two, the defendant can submit evidence to show the prosecutor’s reasoning is

 pretext and the prosecutor can offer surrebuttal before the trial court makes its

 “ultimate ruling under step three”). At step three the trial court “consider[s] the

 prosecutor’s race-neutral explanations in light of all of the relevant facts and

 circumstances, and in light of the arguments of the parties,” Hobbs, 374 N.C. at 353,

 841 S.E.2d at 499 (quoting Flowers, 139 S. Ct. at 2243), so for consistency defendants

 must have given that information prior to step three. Notably, the opportunity for

 surrebuttal does not change the otherwise low bar prosecutors have at the second

 step to give a race neutral explanation.

¶ 38 The United States Supreme Court recognized that low bar when it said the

 Batson inquiry proceeds to step three “even if the State produces only a frivolous or

 utterly nonsensical justification for its strike.” Johnson v. California, 545 U.S. 162,
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

171, 125 S. Ct. 2410, 2417 (2005). The history of Batson in our state also

demonstrates this low bar. Our courts have only once upheld a Batson objection to a

prosecutor’s striking of a juror of color at step two of the inquiry. See State v.

Robinson, 375 N.C. 173, 178 & n.4 846 S.E.2d 711, 716 & n.4 (2020) [hereinafter

“Robinson III”] (stating the Supreme Court of North Carolina has never held a

prosecutor intentionally discriminated against a juror of color before mentioning a

case where this Court found a Batson violation because of the prosecutor’s lack of

explanation); see also Clegg, ¶ 112 (Earls, J., Concurring) (updating history of Batson

challenges in the state to note Clegg was the first case where our courts have ever

found a substantive Batson violation at step three).6 In that case, the prosecutor

offered no explanation at all for striking some of the jurors. State v. Wright, 189 N.C.

App. 346, 352–54, 658 S.E.2d 60, 64–65 (2008). As our Supreme Court recently

emphasized, the inquiry at step two “is limited only to whether the prosecutor offered

reasons that are race-neutral, not whether those reasons withstand any further

scrutiny; that scrutiny is reserved for step three.” Clegg, ¶ 62 (emphasis added).

6 We acknowledge Defendant cited this history of Batson in our state to argue in favor of its

step two argument. As explained below, our precedents do not allow us to strengthen step
two regardless of Defendant’s admonition in his reply brief that this Court and our Supreme
Court can do the work of strengthening Batson. As an intermediate appellate court, we are
ultimately bound by higher precedents. E.g. State v. Jones, 253 N.C. App. 789, 796, 802
S.E.2d 518, 523 (2017). In addition, our Supreme Court has very recently reiterated the three-
step analysis, including the low bar of step two, in State v. Clegg. Id., ¶ 62.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

¶ 39 Defendant’s Batson step two argument fails because it misunderstands the low

 level of the bar a prosecutor must clear at that step. The second step does not require

 evidence in the record to support the prosecutor’s articulated reason; a prosecutor

 must merely articulate a reason, see Wright, 189 N.C. App. at 352–54, 658 S.E.2d at

 64–65 (finding error when prosecutor failed to articulate any reason for striking some

 jurors), and one that does not inherently reveal discriminatory intent. Hobbs, 374

 N.C. at 352, 841 S.E.2d at 499. Given the explanation can be “frivolous or utterly

 nonsensical,” Johnson, 545 U.S. at 171, 125 S. Ct. at 2417, a potentially legitimate

 explanation for which the prosecutor lacked evidence could also pass step two. See

 Lyons, 343 N.C. at 13, 468 S.E.2d at 209 (explaining prosecutors pass step two if their

 reason was based on “legitimate hunches and past experience”).

¶ 40 Our Supreme Court’s precedent further supports our determination a

 prosecutor does not need record evidence to pass Batson’s second step. In State v.

 King, our Supreme Court rejected the defendant’s argument “there is no evidence in

 the record to support the prosecutor’s belief . . . .” 353 N.C. at 471, 546 S.E.2d at 587–

 88. In that case, the prosecutor said he struck a Black juror because he had

 information of an investigation into the juror’s father that forced the father to resign

 from the police department. Id., 353 N.C. at 470–71, 546 S.E.2d at 587. The Supreme

 Court emphasized the issue at step two is the “facial validity” of the prosecutor’s

 stated reason. Id., 353 N.C. at 471, 546 S.E.2d at 587–88 (citing Hernandez, 500 U.S.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 at 360, 111 S. Ct. 1859). In King, the Supreme Court ultimately did not find a Batson

 violation, so the prosecutor’s reason must have passed step two. Id., 353 N.C. at 472,

 546 S.E.2d at 588.

¶ 41 Here, we follow King and reject Defendant’s argument that the trial court erred

 at Batson’s second step because there was no evidence in the record to support the

 prosecutor’s strikes of R.S. for his undisclosed criminal record and of V.B. for her

 business’s connection to a drug investigation. Neither of those challenged

 explanations7 is inherently discriminatory because they do not rely on the jurors’ race

 or race-based discriminatory stereotypes. See Hobbs, 374 N.C. at 352–53, 841 S.E.2d

 at 499 (explaining a reason will be deemed race-neutral if not inherently

 discriminatory). Beyond this inquiry, any “scrutiny is reserved for step three.” Clegg,

 ¶ 62. Therefore, the trial court did not clearly err at step two in concluding the

 prosecutor articulated race-neutral reasons for his strikes of R.S. and V.B.

¶ 42 While Defendant cites an Arizona Court of Appeals case, State v. Ross, 483

 P.3d 251 (2021), in support of his position, we reject that potentially persuasive

 precedent in the face of King’s binding precedent. We also note the Arizona case

 involved a prosecutor’s strike based on the potential juror’s conduct in the courtroom,

 Ross, 483 P.3d at 258–59, ¶¶ 28, 31, which was not the reasoning for the strikes here.

 7 The prosecutor also argued V.B. was confused by one of his questions. Defendant did not
 challenge that justification at step two.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 As the United States Supreme Court has recognized, the trial court has a greater

 need to collect evidence when a prosecutor proffers he struck a juror based on the

 juror’s demeanor. See Snyder, 552 U.S. at 477, 479, 128 S. Ct. at 1208–09 (stating,

 “In addition, race-neutral reasons for peremptory challenges often invoke a juror’s

 demeanor (e.g., nervousness, inattention), making the trial court’s firsthand

 observations of even greater importance,” before noting the trial judge made no

 findings of fact as to the juror’s demeanor); see also Clegg, ¶ 47 (citing Snyder’s

 discussion of demeanor and emphasizing the need for the trial court to accept

 evidence of demeanor).8 Notably, Snyder’s discussion of supporting a prosecutor’s

 strike came from its explanation of Batson’s third step. 552 U.S. at 477, 128 S. Ct. at

 1208.

¶ 43 As Snyder illustrates, Defendant fails because he argues courts assess

 evidence supporting the prosecutor’s reasoning at step two rather than step three.

 Instead, under controlling precedent, a court errs “by combining Batson’s second and

 third steps into one, requiring that the justification tendered at the second step be

 not just neutral but also at least minimally persuasive.” Purkett, 514 U.S. at 768,

 115 S. Ct. at 1771. To say a trial judge “must terminate the inquiry at step two when

 8 Clegg’s citation to Snyder’s discussion of demeanor-based reasoning comes in the same
 paragraph it discussed Batson’s second step, Clegg, ¶ 47, but Clegg ultimately found even the
 demeanor-based reasoning passed step two, further emphasizing the step’s low bar. Clegg,
 ¶ 62.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 the race-neutral reason” is not minimally persuasive “violates the principle that the

 ultimate burden of persuasion regarding racial motivation rests with, and never

 shifts from, the opponent of the strike.” Id. (emphasis in original). Here, Defendant’s

 argument threatens to do just that, so we conclude the trial court did not clearly err

 at step two. But we will consider the alleged lack of record evidence to support the

 prosecutor’s strikes under step three, to which we turn next.

 C. Batson Step Three

¶ 44 At Batson’s final step the “trial court must . . . determine whether the

 defendant has met the burden of proving purposeful discrimination.” Bennett II, 374

 N.C. at 592, 843 S.E.2d at 231; see also, Clegg, ¶ 63 (“[I]n step three, the court

 carefully weighs all of the reasoning from both sides to ultimately decide whether it

 was more likely than not that the challenge was improperly motivated.” (cleaned up)).

 To do that, trial courts employ an open-ended list of factors. See Flowers, 139 S. Ct.

 at 2243 (listing factors with the final one being “other relevant circumstances that

 bear upon the issue of racial discrimination”); see also Clegg, ¶ 48 (noting a court can

 consult “all of the circumstances that bear upon the issue of racial animosity” (quoting

 Snyder, 552 U.S. at 478, 128 S. Ct. at 1208)). Defendant’s overarching argument is

 that the trial court clearly erred when it concluded “the State’s strikes were not

 substantially motivated by race . . . .” Defendant then includes numerous sub-

 arguments based on specific factors. We first review the overarching law on the third
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 step as well as the relevant factors, and then we evaluate each of Defendant’s

 arguments.

¶ 45 “At the third step of the analysis, the defendant bears the burden of showing

 purposeful discrimination.” Hobbs, 374 N.C. at 353, 841 S.E.2d at 499. As our

 Supreme Court recently explained:

 “The trial court must consider the prosecutor’s race-neutral
 explanations in light of all of the relevant facts and
 circumstances, and in light of the arguments of the
 parties.” Flowers, 139 S. Ct. at 2243. At the third step, the
 trial court “must determine whether the prosecutor’s
 proffered reasons are the actual reasons, or whether the
 proffered reasons are pretextual and the prosecutor
 instead exercised peremptory strikes on the basis of race.”
 Id. at 2244. “The ultimate inquiry is whether the State was
 ‘motivated in substantial part by discriminatory intent.’ ”
 Id. (quoting Foster v. Chatman, [578] U.S. [488], 136 S. Ct.
 1737, 1754, 195 L.Ed.2d 1 (2016)).

 Id.; see also Clegg, ¶ 85 (including the substantial part language from Flowers and

 then explaining the United States Supreme Court has also articulated the burden as

 “whether it was more likely than not that the challenge was improperly motivated”

 (quoting Johnson, 545 U.S. at 170, 125 S. Ct. at 2417)).

¶ 46 To support the trial court’s evaluation of all the relevant facts and

 circumstances, a defendant can “rely on ‘a variety of evidence to support a claim that

 a prosecutor’s peremptory strikes were made on the basis of race.’” Hobbs, 374 N.C.

 at 356, 841 S.E.2d at 501 (quoting Flowers, 139 S. Ct. at 2243). Relying on Flowers,
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 our Supreme Court in Hobbs listed the following factors:

 • statistical evidence about the prosecutor’s use of
 peremptory strikes against [B]lack prospective jurors as
 compared to white prospective jurors in the case;
 • evidence of a prosecutor’s disparate questioning and
 investigation of [B]lack and white prospective jurors in the
 case;
 • side-by-side comparisons of [B]lack prospective jurors
 who were struck and white prospective jurors who were not
 struck in the case;
 • a prosecutor’s misrepresentations of the record when
 defending the strikes during the Batson hearing;
 • relevant history of the State’s peremptory strikes in past
 cases; or
 • other relevant circumstances that bear upon the issue of
 racial discrimination.

 Id. (citing Flowers, 139 S. Ct. at 2243). As the last factor indicates, that list from

 Flowers is not exclusive, and courts are permitted to consider any relevant

 circumstances. Id. Thus, in the past our courts have also considered “the

 susceptibility of the particular case to racial discrimination.” Porter, 326 N.C. at 498,

 391 S.E.2d at 150 (quotations and citations omitted).

¶ 47 Defendant argues numerous of those factors support his position that “[t]he

 trial court’s conclusion that the State’s strikes were not substantially motivated by

 race was clear error.” We address each factor in turn.

 1. Trial Court’s Ability to Conduct a Proper Comparative Juror Analysis

¶ 48 Defendant first argues the trial court “could not conduct a proper comparative

 juror analysis as to the prosecutor’s unsupported justifications.” Specifically,
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 Defendant argues the trial court did not have the information it needed to compare

 R.S.’s criminal records, the connection of V.B.’s business to a drug investigation, and

 what the prosecutor knew about those characteristics in jurors. These arguments

 resemble the one Defendant made above at step two, but this factor should be

 analyzed at Batson’s third step instead. Further, Defendant asserts the “prosecutor’s

 failure to conduct any investigation into those matters on the record either during

 voir dire or at the hearing is itself indicative of pretext.” We briefly explain the law

 of comparative juror analysis before addressing each of those arguments in turn.

¶ 49 In Miller-El II, the United States Supreme Court recognized comparing struck

 venire members of color to white people allowed to serve was “more powerful” than

 “bare statistics” of strike rates alone. 545 U.S. at 241, 125 S. Ct. at 2325. “If a

 prosecutor’s proffered reason for striking a [B]lack panelist applies just as well to an

 otherwise-similar non[B]lack [person] who is permitted to serve, that is evidence

 tending to prove purposeful discrimination to be considered at Batson’s third step.”

 Id. The similar white jurors need not be identical. Flowers, 139 S. Ct. at 2249. In

 Miller-El II, for example, strong similarities between the struck Black venire

 members and the non-Black jurors were sufficient to conclude a comparative juror

 analysis supported a finding that race was significant in determining who was

 challenged. 545 U.S. at 247, 252, 125 S. Ct. at 2329, 2332.

¶ 50 We first address Defendant’s argument that the trial court did not have the
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 information it needed to compare R.S.’s criminal record to other potential jurors. We

 reject Defendant’s argument because we disagree with what he asserts the record

 must include. Defendant faults the trial court for not asking the prosecutor to provide

 criminal history reports or his “cheat sheet” on potential jurors’ criminal histories,

 but the trial court was not required to do so. A key feature of the Batson inquiry is

 the trial court’s evaluation of the prosecutor’s credibility. See Hernandez, 500 U.S. at

 365, 111 S. Ct. at 1869 (explaining deference to trial court because the Batson inquiry

 “largely will turn on evaluation of credibility” (quotations and citation omitted)).

 Here, the trial court was inherently evaluating the prosecutor’s credibility when it

 accepted his representations as to running criminal history checks on all jurors and

 learning of R.S.’s criminal record. Therefore, the trial court had the proper record

 before it even without the actual documents the prosecutor used.

¶ 51 Defendant emphasizes, in making the lack of record argument, the trial court’s

 comment at the remand hearing that it was accepting the prosecutor’s statement

 regarding R.S.’s criminal history “as the gospel.” While the trial court’s language was

 hyperbole, the context surrounding that statement reveals the trial court did not

 foreclose the possibility the prosecutor was wrong. Rather, after Defendant’s

 attorney brought up the lack of evidence in the record of R.S.’s criminal history, the

 trial court asked about whether Defendant had evidence that criminal history

 representation was wrong:
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 [MR. ROZEAR (one of Defendant’s attorney’s)]: . . . . And I
 first note that we don’t have anything in the record in front
 of us showing the existence of this conviction, so I’m not
 sure that –
 THE COURT: Are you saying that Mr. Thigpen is not
 correct when he said he had that criminal record?
 MR. ROZEAR: I -- I -- I don’t know. I have no --
 THE COURT: The Court’s accepting that as the gospel. I
 don’t think he would have said that if that wasn’t the case.
 I can’t imagine -- now if it isn’t the case, obviously, we’ve
 got a problem.
 MR. ROZEAR: Right.
 THE COURT: But I don’t think I would make that
 accusation unless you’ve got some basis for it.
 MR. ROZEAR: Fair enough, Your Honor.

This exchange came after the trial court offered Defendant’s counsel time for a recess

to do their own research into the information on criminal history, but Defendant’s

counsel declined after conferring briefly. Defendant’s counsel had the same access to

criminal records of the jurors as the State, and if Defendant’s counsel believed the

State misrepresented this information, he was free to check to confirm it. Thus, the

trial court was open to evidence the prosecutor was wrong about R.S.’s criminal

history, but Defendant simply did not present any evidence after having declined the

trial court’s offer to give him time to independently research criminal histories of

prospective jurors. The trial court was not required to do any more. See State v.

Smith, 352 N.C. 531, 540–41, 532 S.E.2d 773, 780–81 (2000) (rejecting defendant’s

appeal on Batson issue when the prosecutor’s reasoning was based on a potential

juror’s unrevealed criminal record and defendant, when given the chance, had not
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 sought criminal record information to support its argument that reasoning was

 pretextual). Defendant has not carried the burden to show purposeful discrimination

 at this step. Bennett II, 374 N.C. at 592, 843 S.E.2d at 231.

¶ 52 Defendant makes a similar argument about the lack of ability to compare

 between jurors with respect to the prosecutor’s reason for striking V.B., specifically

 the alleged connection between V.B.’s business and a drug investigation. We reject

 that argument again because all the reasons we laid out above apply equally here.

 First, the trial court accepted the prosecutor’s statement as credible. Second,

 Defendant failed to present any evidence to the contrary. While we acknowledge

 Defendant could not undertake the same investigation as the prosecution in regard

 to a criminal investigation that did not even result in charges against V.B., this Court

 has accepted a similar explanation in the past. See King, 353 N.C. at 470–72, 546

 S.E.2d at 587–88 (finding no Batson violation when the prosecutor said he struck a

 Black juror because he had information of an investigation into the juror’s father that

 forced the father to resign from the police department). Even without that precedent,

 the connection to the drug investigation is but one reason the prosecutor gave for

 striking V.B., and the comparative juror analysis is but one factor given “[t]he trial

 court must consider the prosecutor’s race-neutral explanations in light of all of the

 relevant facts and circumstances.” Hobbs, 374 N.C. at 353, 841 S.E.2d at 499 (quoting

 Flowers, 139 S. Ct. at 2243) (emphasis added). And as a practical matter, a
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 requirement that the prosecutor present evidence regarding a drug investigation as

 part of the Batson hearing—even where the Defendant has not argued any reason to

 disbelieve the prosecution’s representations about the investigation – could lead to a

 series of mini-trials regarding each challenged juror and risk identifying confidential

 informants. See State v. Jackson, 322 N.C. 251, 258, 368 S.E.2d 838, 842 (warning

 against creating a “trial within a trial” when conducting the Batson examination).

¶ 53 In his third argument, Defendant contends the trial court lacked information

 about what the prosecutor knew about other jurors’ criminal records and potential

 connections to police investigations. As to the criminal records of other jurors,

 Defendant’s argument does not comport with the record. The prosecutor told the trial

 court he had an assistant run the criminal records of everyone on the jury list for him.

 And as a practical matter, the prosecutor would need to know about the past criminal

 records of all potential jurors, as a white juror who failed to answer this question

 truthfully would be of the same concern to the prosecution as a Black juror.

¶ 54 As to the investigation, the prosecutor received that information from the

 deputy sitting with him at counsel’s table. The State argues the prosecutor could not

 “query” the deputy for “a comprehensive check on all the prospective jurors,” so any

 lack of information as to other jurors’ connections to investigations “would not reflect

 a choice to ignore that characteristic.” Given the comparative juror analysis is but

 one factor and the prosecutor offered a separate explanation for striking V.B. before
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 bringing up the investigation, we cannot say the trial court clearly erred based on

 this alone.

¶ 55 In his final argument under the heading about the trial court’s inability to

 conduct a comparative juror analysis, Defendant argues “the prosecutor’s failure to

 conduct any investigation into those matters on the record either during voir dire or

 at the hearing is itself evidence of pretext.” Defendant later expands on this

 argument by highlighting Flowers found “the failure to inquire is itself evidence of

 pretext.” (Citing Flowers, 139 S. Ct. at 2249.) Defendant then argues his counsel

 presented the prosecutor an opportunity during voir dire to clarify his reasoning but

 the prosecutor only argued Defendant’s showing was insufficient to make a prima

 facie case.

¶ 56 Defendant correctly states the law. Disparate investigation and a failure to

 meaningfully voir dire a potential juror on a subject used later to justify a strike could

 be evidence an explanation is pretextual. Flowers, 139 S. Ct. at 2248–49. Still,

 “disparate questioning or investigation alone does not constitute a Batson violation.”

 Id. at 2248; see also Clegg, ¶ 94 (relying on Flowers to explain disparate questioning

 and investigation can inform the trial court’s Batson evaluation but does not alone

 constitute a Batson violation). We have already addressed the allegations of

 disparate investigation above when we discussed what evidence the prosecutor had

 about other jurors’ criminal records and connections to criminal investigations.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

¶ 57 As to the failure to ask the jurors about the topics during voir dire, the

 prosecutor offered explanations at the remand hearing. That differentiates this case

 from Clegg where our Supreme Court recently relied on disparate questioning to find

 a Batson violation by in part noting the prosecutor asked additional questions of a

 Black juror “without explanation.” Id., ¶¶ 93–95. Here, the prosecutor explained he

 did not want to embarrass V.B. or reveal the methods of an undercover investigation.

 As to R.S.’s criminal record, the prosecutor explained he did not want to embarrass

 R.S. and had seen other prosecutors striking jurors for undisclosed criminal records

 without questioning them. Among those explanations, the desire to avoid revealing

 police undercover investigations appears reasonable. The other explanations are

 race-neutral. We agree with Defendant, however, much of the embarrassment of the

 venire members could have been mitigated by conducting voir dire on the subjects

 outside of the presence of the other potential jurors. But again, conducting separate

 voir dire of potential jurors is a time-consuming process. If the prosecutor had

 decided to challenge for cause instead of using a preemptory challenge, perhaps he

 would have requested a separate voir dire to inquire into the undisclosed criminal

 record. Instead, he chose to use a preemptory challenge, avoiding the need for more

 time-consuming and potentially embarrassing questioning of the juror. A factfinder’s

 choice between “two permissible views of the evidence . . . cannot be clearly

 erroneous.” King, 353 N.C. at 470, 546 S.E.2d at 587. As a result, we cannot find
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 clear error here where the trial court accepted plausibly race-neutral explanations

 for Defendant’s failure to question R.S. and V.B. about the subjects the prosecutor

 later used to justify the strikes.

¶ 58 We also reject Defendant’s argument the prosecutor had to create a record

 justifying his strikes at the initial Batson hearing. Defendant points us to a part of

 the initial trial transcript where his attorney indicated there was nothing in the

 State’s voir dire about prior criminal convictions or other bases for the two jurors

 being excused. Notably, this line was the first sentence after Defendant’s attorney

 made a Batson motion. As such, it was appropriate for the prosecutor to respond by

 arguing Defendant had not made out a prima facie case. The inquiry was still at step

 one where Defendant had the burden to make out a prima facie case, which comes

 before the prosecutor would have a burden to offer any explanation let alone defend

 it against charges of pretext. See Bennett II, 374 N.C. at 592, 843 S.E.2d at 231

 (laying out the three Batson steps). Thus, this was not the appropriate stage for the

 prosecutor to present an explanation or evidence regarding reasons for striking the

 jurors. If we were to accept Defendant’s argument, as a practical matter, the State

 would have to demonstrate cause for every strike of a Black juror instead of using

 peremptory strikes, but that is not the law.

¶ 59 Reviewing all of Defendant’s arguments on the trial court’s ability to conduct

 a proper comparative juror analysis, we cannot conclude the trial court clearly erred.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 2. Comparative Juror Analysis

¶ 60 After arguing the trial court could not have conducted a proper comparative

 juror analysis, Defendant includes his own comparative juror analyses for the

 challenges based on both R.S.’s criminal record and V.B.’s confusion when answering

 a question. Defendant argues the analysis of other jurors’ criminal records reveals

 “there is reason to be skeptical of the trial court’s findings.” Similarly, Defendant

 contends the prosecutor’s confusion reasoning for V.B. “does not withstand scrutiny.”

 We address each argument in turn.

¶ 61 First, Defendant asks us to take judicial notice of numerous traffic violations

 of venire members to support his argument the trial court was wrong to find R.S. was

 the only potential juror who had personal interaction with the criminal justice

 system, even traffic violations. Assuming arguendo the jurors’ traffic violations as

 compiled by Defendant are accurate, we are not persuaded they demonstrate the trial

 court clearly erred in finding the State’s strikes were not substantially motivated by

 race. The trial court’s findings on jurors’ personal interaction with the criminal

 justice system mention interactions “even related to traffic violations”:

 Prospective Juror [R.S.] was the only juror that ADA
 Thigpen noted who had a felony or misdemeanor
 conviction, and indeed was the only prospective juror ADA
 Thigpen noted as having any personal interaction with the
 criminal justice system, even related to traffic violations.

 But, the prosecutor’s initial explanation focused on felony convictions:
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 So as it relates to, first, Perspective Juror Number 10,
 [R.S.], Judge, based upon the information that I had, [R.S.]
 had an undisclosed criminal record that included a
 conviction for common law robbery and possession with
 intent to sell an unauthorized recording device . . . and a
 probation violation. I made a note of his record. When he
 was called into the box, and if it -- and it was important to
 me because of the prior felony conviction. He’s the only juror
 of which I made that note and he’s the only juror that I
 noted had a prior felony conviction.

(Emphasis added.) Thus, the trial court’s Finding of Fact overstated what the

prosecutor had said at the hearing. Given that Batson’s second step, which sets up

the third step here, focuses on the prosecutor’s explanation, Hobbs, 374 N.C. at 352–

53, 841 S.E.2d at 499, we will take his actual explanation as controlling rather than

the court’s overstated summary.9

9 Defendant argues the prosecutor drafted the order signed by the trial court and thus we

should attribute that overstatement of the prosecutor’s reasons to him and find it “reeks of
afterthought.” (Citing Miller-El II, 545 U.S. at 246, 125 S. Ct. at 2328.) While both parties
were to present proposed orders to the trial court, we do not have before us the proposed
orders for comparison to the final order. As such, we are not willing to assign responsibility
for this overstatement to the prosecutor specifically or the State more generally. And
regardless of which draft the trial court used—if either—the trial judge is ultimately
responsible for the order. See In re A.B., 239 N.C. App. 157, 167, 768 S.E.2d 573, 579 (2015)
(“[T]he order is the responsibility of the trial court, no matter who physically prepares the
draft of the order.”).

We also note this explanation does not reek of afterthought because the prosecutor made
clear he was not concerned about traffic violations during the original jury selection process.
The prosecutor specifically excluded speeding tickets from his questions about jurors’ past
convictions. The trial court also noted in its Findings of Fact the prosecutor excluded traffic
tickets when asking jurors about their past interactions with the criminal justice system:
“Prospective Juror [R.S.] was the only juror who did not answer the questions truthfully
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

¶ 62 Taking the explanation given by the prosecutor at the remand hearing’s step

 two portion, the comparative juror analysis compiled by Defendant does not persuade

 us. With the exception of a driving while impaired charge, all of the interactions

 listed by Defendant are minor traffic infractions of speeding, registration issues, and

 a seatbelt violation. As for the DWI, the State presents evidence that the prospective

 juror was acquitted on the charge, and we accept that evidence and argument

 arguendo as well since we did the same with Defendant’s evidence. Thus, as the

 prosecutor represented, R.S. was the only juror with a prior felony conviction, so there

 are no substantially similar non-Black jurors with whom to conduct a comparison.

 See Miller-El II, 545 U.S. at 247, 125 S. Ct. at 2329 (setting out the substantially

 similar standard for conducting a comparative juror analysis). The trial court did not

 clearly err by finding there were no substantially similar non-Black jurors based upon

 the prior felony conviction.

¶ 63 Turning to the comparative juror analysis of V.B.’s answers to voir dire

 questions, Defendant begins by arguing our Supreme Court already conducted a

 comparative juror analysis and “held there was an ‘absence of any significant

 because he did not disclose his prior criminal record, despite being part of the full jury panel
 that was asked if any member had been a defendant in a case before (T. p. 34) and asked if
 any juror themselves, a member of their family, or a close friend had ever been charged or
 convicted of anything other than a speeding ticket (T. p. 45).” Therefore, rather than reeking
 of afterthought, the inclusion of traffic violations appears to be a misstatement by the trial
 court; the prosecutor from the beginning did not care about them.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

dissimilarity between the answers given’” by another juror and V.B. (Citing Bennett

II, 374 N.C. at 599, 843 S.E.2d at 235–36.) While the Supreme Court found an

“absence of any significant dissimilarity between the answers given” by R.S., V.B.,

and the third juror, it only used that to conclude Defendant had made out a “prima

facie case of purposeful discrimination.” Bennett II, 374 N.C. at 599, 843 S.E.2d at

235–36. The prima facie first step of a Batson analysis, however, is fundamentally

different from the third step the trial court had to address and we now confront. As

our Supreme Court explained in a case that came out a month before Bennett II, the

burden on the defendant at step one “is one of production, not of persuasion. That is,

a defendant need only provide evidence supporting an inference discrimination has

occurred.” Hobbs, 374 N.C. at 351, 841 S.E.2d at 498. In Bennett II, the Supreme

Court further explained “the existence of such a permissible inference” is not “the

same thing as an ultimate conclusion that impermissible discrimination has, in fact,

taken place.” 374 N.C. at 598, 843 S.E.2d at 235 (citing Johnson, 545 U.S. at 171,

125 S. Ct. at 2417–18). “As a result, a court should not attempt to determine whether

a prosecutor has actually engaged in impermissible purposeful discrimination at the

first step of the Batson inquiry.” Id., 374 N.C. at 599, 843 S.E.2d at 235. Given these

admonitions, we reject Defendant’s argument that the Supreme Court’s analysis of

the similarity between V.B. and other jurors at step one should control our analysis

here at step three.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

¶ 64 Conducting our own comparative juror analysis, the prosecutor explained he

 struck V.B. because “she appeared to have some difficulty with what I call the ‘watch-

 it-happen question,’” which is “a question about whether or not a juror could make a

 decision based only upon hearing testimony.” The prosecutor explained he started

 asking that question after hearing about an 11 to 1 hung jury in a colleague’s case in

 another county because the holdout juror in that case “said he could not make a

 decision unless he saw it happen.” The prosecutor went on to explain:

 I noted that [V.B.] looked confused by the question.
 She said she could base her decision on “kind of both” or
 “kind of on both.” I tried to clarify that by asking her what
 she meant and she replied, “Sometimes I guess it’s better
 not to have hearsay.”
 Well, Judge, that told me that she preferred maybe
 video evidence or something other than just live testimony.
 I knew that there would not be any video testimony.
 Officers in this case don’t have or did not wear body
 cameras and did not have in-car. I tried to clarify that
 question again and her answer was, “Yeah.” I asked the
 question again and her [sic] she responded, “Uh-huh.” So,
 at that point, I’m beginning to get concerned that she’s
 telling me what she thinks I want to hear, and I’m
 questioning does she understand what I’m asking. She is
 the only juror that gave those responses and had that
 apparent difficulty with that question.”

 The question before us is whether the prosecutor’s proffered reason above “applies

 just as well to an otherwise-similar” non-Black juror. Miller-El II, 545 U.S. at 241,

 125 S. Ct. at 2325.

¶ 65 Defendant first argues we should not accept this explanation because it was
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 based on demeanor and such explanations should be viewed with greater scrutiny.

 Reading the whole explanation given by the prosecutor, we do not agree that his

 reasoning for striking V.B. was based on demeanor. While the prosecutor noted V.B.

 looked confused, he then spent two paragraphs discussing how her answers exhibited

 what he believed was confusion and otherwise concerned him. While the case

 Defendant cites does not provide any explanation of what it means by demeanor-

 based strikes because its analysis does not turn on jurors struck for those reasons,

 see Harris v. Hardy, 680 F.3d 942, 965 (7th Cir. 2012) (explaining those strikes are

 troubling but consideration of them was unnecessary because the defendant carried

 his burden elsewhere), plain meaning alone demonstrates the prosecutor’s reasoning

 was not demeanor-based. Further, in Clegg, our Supreme Court recently found a

 Batson violation based in part on its rejection of the prosecutor’s demeanor-based

 reasoning. Id., ¶¶ 77–78 (demeanor analysis), ¶ 100 (ultimately concluding there was

 a Batson violation). There, the prosecutor’s reasoning was based on demeanor when

 he mentioned the potential juror’s “body language and lack of eye contact.” Id., ¶ 77.

 Here, the prosecutor did not primarily focus on V.B.’s demeanor. Rather, the

 prosecutor’s explanation was based on V.B.’s answers in the record; he noted the

 appearance of confusion only as an introduction to his reasoning, which was based

 upon actual responses, not V.B.’s demeanor.

¶ 66 Turning to a comparison based on V.B.’s answers, Defendant argues V.B. was
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 similar to a “non-Black” juror, R.C. Defendant argues R.C. exhibited similar

 behavior, which the prosecutor characterized as confusion with V.B.’s answers, when

 the prosecutor asked R.C. a question about whether she would not be able to consider

 the testimony of a witness testifying pursuant to a plea agreement. Rather than

 challenge Defendant’s representation of R.C.’s answers, the State responds the

 difference in the questions to which each potential juror responded meant they were

 not substantially similar and thus could not be compared.

¶ 67 As our Supreme Court noted in Bennett II, the relevant colloquy between V.B.

 and the prosecutor, Mr. Thigpen, occurred as follows:

 MR. THIGPEN: Do you think you could reach a verdict
 based only on hearing the evidence from the witness stand,
 or do you feel like in order to reach a verdict or to make a
 decision you would have to actually watch the alleged event
 happen?
 [V.B.]: Yeah.
 MR. THIGPEN: Okay. You looked confused. Some people—
 I have had jurors before that have said, “I can’t make a
 decision until I see it happen.”
 [V.B.]: Uh-huh.
 MR. THIGPEN: Okay. Do you feel like you could base your
 decision on just what the witnesses say, or do you feel like
 you have to watch it happen?
 [V.B.]: Kind of on both.
 MR. THIGPEN: What do you mean?
 [V.B.]: Sometimes, I guess, it’s better to not have hearsay.
 MR. THIGPEN: Well, if you watched it happen, you would
 be a witness; right?
 [V.B.]: Right.
 MR. THIGPEN: And if you were a witness, you can’t be a
 juror. Does that make sense?
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 [V.B.]: Yes.
 MR. THIGPEN: So the only thing we have is witness
 testimony.
 [V.B.]: Okay.
 MR. THIGPEN: So do you feel like you could make a
 decision based only on hearing the testimony of the
 witnesses or before you could make that decision would you
 actually want to watch it happen?
 [V.B.]: Yeah.
 MR. THIGPEN: Okay. What you said was, “Yeah.”
 [V.B.]: Yeah, I could make that decision through—
 MR. THIGPEN: Based on the testimony?
 [V.B.]: Uh-huh.

 374 N.C. at 583–84, 843 S.E.2d at 226.

¶ 68 The relevant exchange between the prosecutor and R.C. occurred as follows:

 MR. THIGPEN: Okay. Now, [R.C.], a witness may testify
 on behalf of the State as a result of a plea agreement with
 the State in exchange for [a] sentence concession. Based on
 that fact and that fact alone, would you not be able to
 consider that person’s testimony along with all other
 evidence that you would hear in the case?
 [R.C.]: Yes, sir. No, sir.
 MR. THIGPEN: Do you understand my question?
 [R.C.]: Say it again.
 MR. THIGPEN: A witness may testify under a plea
 agreement in exchange for a sentence concession.
 [R.C.]: Okay.
 MR. THIGPEN: Now if that person were to testify, are you
 just going to go, [t]his person’s made a deal; I don’t care
 what they are going to say, or would you listen to it and
 consider it just like anybody else?
 [R.C.]: I would listen to their testimony and consider it.

 Id., 374 N.C. at 585, 843 S.E.2d at 227 (all alterations other than removing juror

 name in original). Arguably, R.C.’s answer of “Yes, sir. No, sir.” resembles V.B.’s
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 answer of “Kind of on both” in that each one equivocates and requires further

 explanation. But it is also true that the question to R.C. was confusing since it was

 phrased in the negative: “would you not be able to consider . . . .” Id. Thus, to give

 an affirmative answer would require a negative response, essentially, “No, sir, I

 would not not be able to consider . . . .” After answering, “Yes, sir,” it appears R.C.

 realized the question was phrased with a “not” so she changed the answer to “No, sir.”

¶ 69 Whether R.C’s answer demonstrated confusion based on a question phrased in

 the negative or equivocation, we agree with the State the trial court did not clearly

 err in finding the confusing answers were not substantially similar because of the

 questions to which each responded. The prosecutor explained at the remand hearing

 that R.C.’s answer was “not as big an issue” to him because he “expect[ed] people to

 be skeptical of confidential informants, of cooperating codefendants” and was not

 planning on calling the witness who would be testifying pursuant to the plea

 agreement. By contrast, the prosecutor explained the question he asked to V.B. was

 critical because he was concerned “she regarded testimony as hearsay” and his whole

 case was “going to be witness testimony.” The prosecutor went on to explain he knew

 about a prior case that had a jury hang 11 to 1 on not having video to watch it happen.

 This rationale built on the prosecutor’s initial explanation that he struck V.B. because

 she said she preferred video evidence but he knew “there would not be any video

 testimony.” As a result, the question on which V.B. gave confusing answers was far
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 more material to the prosecution’s case than the question to which R.C. gave

 confusing answers.

¶ 70 The trial court gave a similar explanation for why it did not credit the

 comparison between R.C. and V.B.:

 Any similarity between prospective Jurors [V.B.] and
 [R.C.] on the basis of momentary confusion does not
 support an inference of discriminatory intent. Prospective
 Juror [V.B.] was confused on an issue that touched almost
 every piece of evidence in the State’s case but Juror [R.C.]’s
 confusion was on an issue not even at play in the State’s
 case.

 Based on our review of the confusing answers of V.B. and R.C., we conclude the trial

 court did not clearly err in determining they were not substantially similar, as would

 be required to support a Batson violation.

 3. Susceptibility of Case to Racial Discrimination

¶ 71 After finishing with his two arguments related to the comparative juror

 analysis factor, Defendant contends the trial court clearly erred in determining “this

 case was not susceptible to racial discrimination . . . .” To support that argument,

 Defendant provides law review articles and reports from nonprofit organizations,

 which according to Defendant show “[c]riminal cases are susceptible to racial bias at

 all stages” and that drug cases are particularly susceptible “given pervasive cultural

 stereotypes and disparities in law enforcement related to drugs.” Defendant then

 argues the trial court erred because it focused on the race of witnesses, the
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 anticipated evidence, and the lack of victims rather than “the effect of bias and racial

 stereotypes on jurors.” (Emphasis in original.) Defendant further faults the trial

 court for saying evidence of disparate arrest and imprisonment rates for drug crimes

 would be applicable to every case with an African-American defendant.

¶ 72 At Batson’s third step, “the judge should consider the susceptibility of the

 particular case to racial discrimination.” Porter, 326 N.C. at 498, 391 S.E.2d at 150.

 “The race of the defendant, the victims, and the key witnesses bears upon this

 determination.” Id., 326 N.C. at 498, 391 S.E.2d at 150–51. Specifically, our courts

 have focused on whether the case crosses racial lines among those key figures.

 Contrast id., 326 N.C. at 500, 391 S.E.2d at 152 (finding no error in trial court’s third

 step analysis based in part on the fact that the victim, both of the defendant’s counsel,

 and the defendant were all Native American) and State v. Fair, 354 N.C. 131, 142,

 557 S.E.2d 500, 511 (2001) (finding the jury selection process was “less likely to be

 susceptible to racial discrimination” when the defendant, victim, and half of the

 State’s witnesses were African-American) with Golphin, 352 N.C. at 432, 533 S.E.2d

 at 214 (explaining “this case may be one susceptible to racial discrimination because

 defendants are African-Americans and the victims were Caucasian”).

¶ 73 Defendant contends he presented significant evidence about “pervasive

 cultural stereotypes and disparities in law enforcement related to drugs” as part of

 his argument that this case was susceptible to racial discrimination because
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 Defendant is Black and faced prosecution for a drug offense. In particular, Defendant

 presented law review articles, academic journal articles, and a study by the ACLU

 regarding disparate arrest and sentencing rates for Black people for drug crimes.

 Even if we assume the conclusions of the authors of these articles and the study are

 correct, that type of evidence is not what our Supreme Court meant in Porter when it

 listed “the susceptibility of the particular case to racial discrimination” as a relevant

 third step factor. Porter, 326 N.C. at 498, 391 S.E.2d at 150. Rather, as seen in Porter

 and subsequent cases expanding on the factor, a case is particularly susceptible to

 racial discrimination if the identities of the defendant, victims, and witnesses cross

 racial lines. See id., 326 N.C. at 500, 391 S.E.2d at 152; Fair, 354 N.C. at 142, 557

 S.E.2d at 511; Golphin, 352 N.C. at 432, 533 S.E.2d at 214 (all focusing on racial

 identity of those key players and whether it is the same or different across those

 groups).

¶ 74 Here, the trial court found Defendant is African-American, there were no

 victims, and “[t]here is no record of the race of key witnesses.” The trial court also

 found there was no evidence of “any potential racial motivations on the part of any

 witness.” Based upon these Findings, the trial court determined the case was not

 susceptible to racial discrimination and emphasized that there were no cross racial

 issues. The trial court did not err in that analysis; it did exactly what our caselaw

 required it to do. Where there is no evidence of any racial motivations or
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 discrimination in the particular case under review, our precedent does not allow us

 to account in some sort of general philosophical way for “the effect of bias and racial

 stereotypes on jurors” as Defendant wants us to consider. If Defendant wants to

 argue the precedent should change or be expanded upon, that argument is more

 properly directed at our Supreme Court. E.g., Jones, 253 N.C. App. at 796, 802 S.E.2d

 at 523 (“[T]his Court has no authority to reverse existing Supreme Court precedent.”

 (quotations and citation omitted)).

¶ 75 The trial court also found:

 the defendant argued that the case was susceptible to
 racial discrimination because of (1) disparate arrest rates
 for marijuana possession and ‘in general’ and (2) disparate
 rates of imprisonment after conviction. These facts, if true,
 would not give a prosecutor motivation to keep members of
 a particular race off the jury. The facts the defendant cited,
 if true, are applicable to every case with an African-
 American defendant, thus making this case not
 ‘particularly susceptible’ to racial discrimination.

 (Citations omitted.) Defendant argues that the trial court appeared to hold “that,

 because all Black people may face racial discrimination within the criminal justice

 system, no individual Black person can argue that such discrimination could affect

 their specific case.” We do not read the trial court’s finding so broadly. The trial court

 was correct that Defendant’s argument, as stated, would in fact mean that every case

 with a Black defendant would be considered as “particularly susceptible” to racial

 discrimination for purposes of a Batson analysis, but that is not the law. Even if we
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

accept as true Defendant’s evidence which indicates Black people have a disparate

arrest rate and rate of imprisonment after conviction for marijuana possession and

“in general,” this does not mean that a particular case is “susceptible to racial

discrimination” for purposes of the Batson analysis.10 While our precedent does not

allow us to consider such disparate impact evidence for the susceptibility analysis,

this type of evidence could be relevant to a trial court’s consideration of a defendant’s

Batson argument, depending upon the particular features of the case under

consideration, including the crime charged, the races of the defendant, victims, and

witnesses, and other unique facts of a particular case. See Batson, 476 U.S. at 97–

98, 106 S. Ct. at 1723 (“The core guarantee of equal protection, ensuring citizens that

their State will not discriminate on account of race, would be meaningless were we to

approve the exclusion of jurors on the basis of such assumptions, which arise solely

from the jurors’ race.”).11 The trial court properly conducted the analysis required by

our precedent and did not clearly err in finding this case was not susceptible to racial

discrimination.

 4. History of Racial Discrimination in Jury Selection in Sampson
 County

10 Defendant’s charges were related to methamphetamine, not marijuana. See Bennett II,
374 N.C. at 581, 843 S.E.2d at 224–25 (summarizing charges); id., 374 N.C. at 587–88, 843
S.E.2d at 228–29 (noting convictions on methamphetamine charges).
11 Just before that quote, Batson also explains the Equal Protection Clause “forbids the States

to strike [B]lack veniremen on the assumption that they will be biased in a particular case
simply because the defendant is [B]lack.” 476 U.S. at 97, 106 S. Ct. at 1723.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

¶ 76 Defendant’s fourth argument asserts the trial court clearly erred in

 disregarding “the history of discriminatory strikes by the State . . . .” Defendant first

 recounts how he presented a Michigan State University (“MSU”) study to the trial

 court that found, across three capital cases between 1990 and 2010, prosecutors in

 Sampson County struck 73.9% of qualified Black venire members but struck only

 19.4% of qualified non-Black venire members.12 Defendant later notes he told the

 trial court the results of the MSU study have been replicated by a Wake Forest

 University study. Defendant then takes issue with each of the four reasons the trial

 court gave for discounting the study. According to Defendant, the trial court was

 wrong to discount the MSU study: (1) on the basis that recent law school graduates

 collected the data because the United States Supreme Court has cited data with that

 collection method; (2) on the basis prosecutors “were not consulted in conjunction with

 the study” because our Supreme Court has “repeatedly cited, discussed, and relied

 12 The authors of the MSU study are two associate professors at the Michigan State
 University College of Law. Catherine M. Grosso & Barbara O’Brien, A Stubborn Legacy: The
 Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina
 Capital Trials, 97 Iowa L. Rev. 1531, 1531 n.aa1 (2012). They “examined jury selection in at
 least one proceeding for each inmate who resided on North Carolina’s death row as of July 1,
 2010, for a total of 173 proceedings.” Id. at 1542–43. According to Defendant, three of these
 capital cases were from Sampson County, but the article cited does not identify the counties
 where the proceedings occurred. The article does include a footnote regarding a “list of
 current death row inmates” available at the website of the North Carolina Department of
 Public Safety and that list identifies the county where each was convicted. Id. at 1533 n.6.
 Obviously the inmates listed on the website have changed since publication of the article in
 2012, but we will assume for purposes of this opinion that Defendant’s representation of three
 cases as of July 2010 from Sampson County is correct.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 upon” the MSU study “when describing the history of discrimination in jury selection

 in various counties in our State”; (3) on the basis the MSU study was conducted on

 cold trial transcripts because “[e]very single Batson decision from the Supreme Court

 has been decided on a cold record”; and (4) on the basis the prosecutor in this case

 was not involved in the MSU study cases because Batson-line precedents do not

 require historical evidence to directly show the specific prosecutor has a history of

 discrimination.

¶ 77 As a preliminary matter, we agree with Defendant’s summary of the trial

 court’s reasoning for determining “the MSU study’s conclusions are of limited, if

 any[,] usefulness . . . .” We also agree the trial court’s first three reasons, as listed in

 the numbering above, do not support discounting the MSU study. For any study, the

 trial court should evaluate the purpose of the study and its methodology and

 reliability, but just the fact that law students provided assistance does not make it

 reliable or unreliable, without more information. Defendant notes that Justice

 Breyer’s concurrence in Miller-El II cites at least one study where law students

 provided research assistance. See Miller-El II, 545 U.S. at 268, 125 S. Ct. at 2341

 (Breyer, J. Concurring) (citing Baldus, Woodworth, Zuckerman, Weiner, & Broffitt,

 The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical

 Analysis, 3 U. Pa. J. Const. L. 3, 52–53, 73, n.197 (2001)); Baldus et al., The Use of

 Peremptory Challenges, supra, at 3 n.a1 (listing law students who provided research
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 assistance). While Justice Breyer used the evidence to show discriminatory use of

 peremptory challenges remains a problem in general rather than in a specific case as

 Defendant argues for here, Miller-El II, 545 U.S. at 268, 125 S. Ct. at 2341, his

 citation at least indicates support for analysis based on law student data collection.

 Also, in general law students appear capable of collecting data under the supervision

 of researchers.

¶ 78 Turning to the trial court’s second criticism of the lack of prosecutorial opinions

 in the study, we again agree with Defendant that reason does not necessarily

 undermine the study. Again, the trial court must consider the methodology of each

 study and the purpose for which the information is presented. The results of a study

 may be more trustworthy if the methodology is sound and it draws information from

 more sources, but it is not necessarily of no value based on the lack of prosecutorial

 opinions. In addition, as Defendant notes, our Supreme Court has favorably cited the

 MSU study multiple times, albeit all in the context of Racial Justice Act claims rather

 than Batson. Robinson III, 375 N.C. at 179–80, 846 S.E.2d at 717; State v. Augustine,

 375 N.C. 376, 378, 847 S.E.2d 729, 730 (2020); State v. Burke, 374 N.C. 617, 619, 843

 S.E.2d 246, 248 (2020). At the very least, those cites suggest the study’s methodology

 for collecting disparate jury strike percentages was acceptable. See Robinson III, 375

 N.C. at 179–80, 846 S.E.2d at 717 (recounting disparate jury strike evidence). To the

 extent the trial judge’s issue with the MSU study was based on his concerns that it
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 read racial animus from racial disparities without consulting prosecutors who could

 have countered such analytical paths, we address that below with our discussion of

 the trial court’s final criticism.

¶ 79 We also agree with Defendant’s argument that the trial court’s third reason,

 the conducting of the study on a cold record, does not justify discounting it. As

 Defendant points out, all Batson precedents—and indeed our entire appellate court

 system in this state and in this country—rely on reviewing the cold record. While a

 review of the cold record may not be the same as a trial court’s perspective, the

 standard of review takes this factor into account. For example, here, the clear error

 standard of review recognizes the trial court’s superior ability to evaluate credibility

 in comparison to a cold record alone. See King, 353 N.C. at 469–70, 546 S.E.2d at

 586–87 (explaining the clear error standard of review reflects that rulings on race

 neutrality turn on evaluations of credibility); Cummings, 346 N.C. at 309, 488 S.E.2d

 at 561 (explaining trial courts are in the best position to make those credibility

 evaluations). In addition, a court can consider the reliability and completeness of the

 information provided from the cold record in each study. For example, the MSU study

 notes the data sources and methods of collection of information regarding the jurors

 and voir dire for the cases included in the study. Grosso & O’Brien, A Stubborn

 Legacy, supra, at 1542–48. Since the MSU study included only capital murder trials,

 id. at 1533, the records may have been more complete and detailed than would be
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 expected for non-capital and lower-level felony trials.13 Thus, the fact that a study

 is based upon review of the “cold record” of the cases does not necessarily undermine

 its value.

¶ 80 Finally, the trial court discounted the MSU study because it did not show racial

 disparity in juror strikes in past cases involving the prosecutor in this case.

 Defendant contends the trial court was wrong to discount the MSU study on this basis

 because historical evidence does not require “direct evidence that a particular

 prosecutor was involved in past discrimination.” To support this position, Defendant

 relies on the United States Supreme Court’s decision in Miller-El v. Cockrell (Miller-

 El I), 537 U.S. 322, 123 S. Ct. 1029 (2003), and our Supreme Court’s decision in Hobbs.

¶ 81 Defendant’s reliance on Miller-El I and on Hobbs is misplaced because the

 portions he cites come from the cases’ evaluation of Batson’s first step. See Miller-El

 I, 537 U.S. at 346–47, 123 S. Ct. at 1044–45 (stating, “Finally, in our threshold

 examination, we accord some weight to petitioner’s historical evidence of racial

 discrimination by the District Attorney’s Office” before discussing the evidence to

 which Defendant points (emphasis added)); Hobbs, 374 N.C. at 350–51, 841 S.E.2d at

 497–98 (describing how the prima facie step works before then indicating “a court

 13 Even if jury selection information may be more complete for capital murder trials, the study

 does not address whether jury selection statistics from capital murder trials are necessarily
 comparable to lower level felony trials such as Defendant’s trial on charges of possession and
 distribution of methamphetamine precursors and trafficking in methamphetamine.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 must consider historical evidence of discrimination”). As we have explained more

 fully above, a defendant’s burden at Batson’s first step is fundamentally different

 from his burden at Batson’s third step. “At the stage of presenting a prima facie case,

 the defendant is not required to persuade the court conclusively that discrimination

 has occurred.” Hobbs, 374 N.C. at 351, 841 S.E.2d at 498. At the third step,

 defendants are required to persuade the court conclusively that discrimination has

 occurred. See Bennett II, 374 N.C. at 592, 843 S.E.2d at 231 (summarizing Batson’s

 third step as “the trial court must then determine whether the defendant has met the

 burden of proving purposeful discrimination” (emphasis added)). Given this

 difference between the first and third steps in the Batson analysis, we cannot find

 that Miller-El I and Hobbs support Defendant’s argument about the relevance of data

 that Sampson County prosecutors other than the one here struck Black venire

 members at a disproportionate rate.

¶ 82 However, in the time since the trial court made its ruling and the parties

 finished their supplemental briefing, our Supreme Court has clarified statistical

 evidence “regarding the disproportionate use of peremptory strikes against Black

 potential jurors” should be considered.14 Clegg, ¶ 81. Clegg endorsed statistics of

 14 The trial court’s error here is particularly understandable given Defendant did not identify

 a case where evidence of racial disparity alone supported a finding of purposeful
 discrimination at Batson’s third step. Further, the history of Batson, as a Fourteenth
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

disparate strike rates in noncapital cases. See Clegg, ¶ 69 (describing the data), ¶ 81

(accepting the data.) Notably, our Supreme Court in Clegg relied on preliminary

results from the same Wake Forest study Defendant cites. See id., ¶ 68 (explaining

the trial court noted evidence about non-capital cases from Pollitt & Warren, 94 N.C.

L. Rev. at 1964); Daniel R. Pollitt & Brittany P. Warren, Thirty Years of

Disappointment: North Carolina’s Remarkable Appellate Batson Record, 94 N.C. L.

Rev. 1957, 1964 n.44 (2016) (citing “preliminary findings from a study of jury

selection in all non-capital North Carolina felony trials from 2011-2012” conducted

by Wake Forest University School of Law professors showing a 16% strike rate of non-

white potential jurors and an 8% strike rate of white potential jurors); Ronald F.

Wright, Kami Chavis, & Gregory S. Parks, The Jury Sunshine Project: Jury Selection

Data as a Political Issue, 2018 U. Ill. L. Rev. 1407, 1419–20 (Wake Forest professors’

final study cited by Defendant including study of juror strikes in all North Carolina

Amendment Equal Protection Clause case line, Batson, 476 U.S. at 89, 106 S. Ct. at 1719
(“[T]he State’s privilege to strike individual jurors through peremptory challenges[] is subject
to the commands of the Equal Protection Clause.”), has focused on racially discriminatory
purpose rather than racially disproportionate impact alone. See Washington v. Davis, 426
U.S. 229, 239–40, 96 S. Ct. 2040, 2047–48 (1976) (explaining in the equal protection context
in general, “the invidious quality of a law claimed to be racially discriminatory must
ultimately be traced to a racially discriminatory purpose,” such that a violation does not arise
from a state action “solely because it has a racially disproportionate impact” (emphasis
added)). Batson itself explained while evidence of racial disparity may provide
“[c]ircumstantial evidence of invidious intent,” such disparity is not alone enough absent
(near) total exclusive of African Americans from jury venires. 476 U.S. at 93, 106 S. Ct. at
1721. Against this pre-Clegg backdrop, the trial court could understandably have discounted
the racial disparity evidence in the MSU study.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 felony trials in 2011).

¶ 83 Based on Clegg—which was decided after the trial court’s consideration of this

 case—the trial court did not identify a proper basis for failing to take into account

 Defendant’s data showing racially disparate strike rates in Sampson County,

 regardless of whether the same prosecutor in this case was involved in the studied

 cases. Yet we note that a trial court could weigh the usefulness of statistical

 information based upon the timing of the study and any relevant changes in the

 policies or procedures of the prosecutor’s office in a particular county, even if the data

 does not identify the particular prosecutor involved in a case. For example, the MSU

 study began about 25 years and concluded about 5 years before the jury selection in

 this case. See Grosso & O’Brien, A Stubborn Legacy, supra, at 1557 n.101 (noting

 first trial court to review the study summarized it as looking at jury selection

 practices in capital cases in this state between 1990 and 2010). The record does not

 indicate if the practices or policies of the District Attorney’s office in Sampson County

 were the same during the years covered by the study and 2017, when Defendant was

 tried. Our Supreme Court has noted these policies could be quite important. In Clegg

 the Supreme Court noted that in Miller-El II, there was evidence of “‘a specific policy

 [in the prosecutor’s office] of systematically excluding [B]lack[] [people] from juries’

 evidenced by a training manual that ‘outlined the reasoning for excluding minorities

 from jury service.’” Clegg, ¶ 31 (quoting Miller-El II, 545 U.S. at 263–64, 125 S. Ct.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 at 2338–39) (alterations in original). The Wake Forest study was more recent than

 the MSU study but was still based upon information collected at least six years before

 Defendant’s trial. See Wright, Chavis, & Parks, The Jury Sunshine Project, supra, at

 1419 (explaining the project examined all felony trials for which the authors could

 find adequate information in the state in 2011). But even weighing the data in

 Defendant’s favor, we cannot find the trial court clearly erred, as we would be

 required to find to reverse the trial court. See Chapman, 359 N.C. at 339, 611 S.E.2d

 at 806 (explaining standard of review in Batson cases is clear error). Side-by-side

 comparisons of the potential jurors are more powerful than “bare statistics,” Miller-

 El II, 545 U.S. at 241, 125 S. Ct. at 2325, and those comparisons here support the

 prosecutor. Further, we have already concluded the lack of susceptibility of this case

 to racial discrimination favors the prosecutor’s reasoning as well. Given those two

 factors, as well as the final factor we discuss below, the trial court did not clearly err

 in its ultimate determination that Defendant has failed to show purposeful

 discrimination as required at Batson’s third step.

 5. Weight Given to Black Jurors Accepted by the State

¶ 84 Defendant finally argues the trial court “gave improper weight to the Black

 jurors accepted by the State.” Specifically, Defendant alleges the trial court erred in

 finding the prosecutor’s acceptance of three African-American jurors before the initial

 Batson hearing and two after the hearing tended to negate an inference of racial
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 discrimination. Defendant also noted Bennett II rejected the evidence of the

 prosecutor’s acceptance of other Black jurors “when all of the peremptory strikes he

 did use were against Black jurors.” (Emphasis in original; citing Bennett II, 374 N.C.

 at 600–01, 843 S.E.2d at 237.) Lastly, Defendant highlights the “racially-motivated

 strike of even a single juror is a Batson violation, regardless of how many jurors of

 the same race the prosecutor accepted.”

¶ 85 First, as with Defendant’s other arguments based on Bennett II, we note our

 Supreme Court was focused on the first step of the Batson inquiry, whether

 Defendant showed a prima facie case: “[W]e do not find the State’s argument that

 defendant failed to show the existence of the required prima facie case of

 discrimination based upon the fact that the prosecutor accepted three of the five

 African American prospective jurors that were tendered to him for questioning to be

 persuasive.” Bennett II, 374 N.C. at 600–01, 843 S.E.2d at 237 (emphasis added). As

 we have repeatedly explained above, the first step differs significantly from the third

 step. See Hobbs, 374 N.C. at 351, 841 S.E.2d at 498 (explaining the prima facie case

 does not require showing purposeful discrimination).

¶ 86 That being said, the reasoning of our Supreme Court in Bennett II relied on

 Flowers and Miller-El II, both of which are Batson step three cases. See Bennett II,

 374 N.C. at 600–01, 843 S.E.2d at 236–37 (citing Flowers, which in turn cited Miller-

 El II for the idea that the United States Supreme Court was skeptical of the
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 prosecution’s decision to accept one Black juror because it could be done to obscure

 an otherwise consistent pattern of opposition to seating Black jurors); Flowers, 139

 S. Ct. at 2244 (“The question for this Court is whether the Mississippi trial court

 clearly erred in concluding that the State was not motivated in substantial part by

 discriminatory intent when exercising peremptory strikes at Flowers’ sixth trial.”

 (citation and quotations omitted)); Miller-El II, 545 U.S. at 241, 125 S. Ct. at 2325

 (explaining at the start of its analysis that it was looking at “evidence tending to prove

 purposeful discrimination to be considered at Batson’s third step”). And we also

 acknowledge Batson’s central premise that “[i]n the eyes of the Constitution, one

 racially discriminatory peremptory strike is one too many.” See Flowers, 139 S. Ct.

 at 2241 (summarizing Batson as stressing that point).

¶ 87 Still, the trial court did not clearly err by giving weight to the Black jurors

 accepted by the prosecution because the situation here is different from the situations

 warned of in Miller-El II and Flowers. In Miller-El II, the Supreme Court emphasized

 the “late-stage” nature of the decision in contrast to behavior earlier in the jury

 empanelment process. 545 U.S. at 250, 125 S. Ct. at 2330. Here, by contrast, the

 prosecution accepted three Black jurors before striking R.S. and V.B. and accepted

 two more after.

¶ 88 Turning to Flowers, the Supreme Court there emphasized the prosecution

 could not hide behind the fact that it accepted one Black juror at Flowers’s sixth trial
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

given “[t]he overall record of this case,” especially the prosecution having struck all

Black jurors at four previous trials of Flowers. 139 S. Ct. at 2246. Here, as we have

explained throughout the rest of this opinion, the overall record does not present a

clear picture of intentional discrimination as in Flowers. We further note that while

only one Black juror was accepted in Flowers, 139 S. Ct. at 2246, the prosecution here

accepted five. Ultimately, the jury included 5 Black and 7 white jurors. Notably, this

final breakdown includes a higher percentage of Black jurors than the relative

population of Black people within Sampson County at the time15, which reinforces

15The final jury was 41.67% Black. According to United States Census Bureau County
Population Demographics Data from 1 July 2016—the closest available data before
Defendant’s March 2017 trial, Bennett II, 374 N.C. at 581, 843 S.E.2d at 225—non-Hispanic
Black and multiracial people represented 27.15% of Sampson County’s population. See
County Population by Characteristics: 2010-2019, UNITED STATES CENSUS BUREAU (Oct. 8,
2021), https://www.census.gov/data/tables/time-series/demo/popest/2010s-counties-
detail.html (including “Annual County Resident Population Estimates by Age, Sex, Race, and
Hispanic Origin” data as well as a “File Layout” guide to understand the datasets).

We also make two quick notes on our methodology. First, we rely on United States Census
Bureau data because the record did not include data on the population statistics of Sampson
County. However, the record includes the Wake Forest Study discussed above, and that
study used “census information about the population and racial breakdown of each county”
in its analysis. Wright, Chavis, & Parks, The Jury Sunshine Project, supra, at 1422. Since
Defendant relied on a study using similar underlying data, we rely on the same here to
address his arguments.

Second, we explain how we calculated the percentages. After downloading all the North
Carolina data from the Census Bureau, we isolated the data from Sampson County for Year
“9” since that is the year that corresponds to data from 1 July 2016 according to the “File
Layout” guide. We then calculated a total population of 63,225 by summing the “TOT_POP”
columns across all age groups. To get the population of non-Hispanic Black and multiracial
people, we summed the four columns for non-Hispanic Black males (NHBA_MALE), non-
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

 the conclusion the prosecutor did not intentionally discriminate based on jurors’ race.

 Given these differences from Flowers and from Miller-El II, the trial court did not

 clearly err in weighing the prosecution’s acceptance of five other Black jurors.

 III. Conclusion

¶ 89 Having reviewed the entire record, the trial court did not clearly err in

 overruling Defendant’s Batson objections as to either R.S. or V.B. We conclude the

 trial court properly conducted the Batson step two inquiry and find no clear error in

 its determination the prosecution proffered race neutral reasons. We also find no

 clear error in the trial court’s step three evaluation of whether the Defendant met his

 burden of proving purposeful discrimination based on the following relevant factors:

 comparative juror analyses; susceptibility of the case to racial discrimination;

 historical evidence of discriminatory strikes by the Sampson County prosecutor’s

 office; and weight given to the prosecution’s acceptance of other Black jurors before

 and after R.S. and V.B. Therefore, we affirm.

 AFFIRMED.

 Hispanic Black females (NHBA_FEMALE), non-Hispanic multiracial males
 (NHTOM_MALE), and non-Hispanic multiracial females (NHTOM_FEMALE), which
 resulted in a total of 17,165 non-Hispanic Black or multiracial people in Sampson County at
 the time. Finally, we divided the non-Hispanic Black or multiracial population by the total
 population to determine non-Hispanic Black or multiracial people represented 27.15% of the
 population of Sampson County as of 1 July 2016.
 STATE V. BENNETT

 2022-NCCOA-212

 Opinion of the Court

Judges WOOD and JACKSON concur.